Accordingly, the order under review is affirmed.

GLASSBORO, ET AL., PLAINTIFFS, v. GLOUCESTER COUNTY BOARD OF CHOSEN FREEHOLDERS, NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, KINSLEY LANDFILL, INC., THE CITY OF PHILADELPHIA AND THE COUNTY OF CAMDEN, DEFENDANTS, AND TOWNSHIP OF DEPTFORD, DEFENDANT-INTERVENOR.

Superior Court of New Jersey
Appellate Division

Argued December 17, 1984—Decided February 15, 1985.

Before Judges KING, DEIGHAN and BILDER.

*Tyler Wren* of the Pennsylvania Bar, admitted *pro hac vice*, argued the cause for appellant City of Philadelphia (*Tomar, Parks, Seliger, Simonoff & Adourian*, attorneys; *Steven Kudatsky*, of counsel and on the brief).

*Joseph F. Lisa* argued the cause for respondents Borough of Glassboro, Borough of Glassboro Board of Health, Borough of Clayton and Township of Monroe.

*Paul H. Schneider*, Deputy Attorney General, argued the cause for respondents New Jersey Department of Environmental Protection and Commissioner Robert E. Hughey (*Irwin I. Kimmelman*, Attorney General of New Jersey, attorney; *Michael R. Cole*, First Assistant Attorney General, of counsel).

*Bruce C. Hasbrouck* argued the cause for respondent County of Gloucester.

*Timothy S. Haley* argued the cause for respondent Deptford Township (*Gordon and Gordon*, attorneys).

*Edward J. Egan* argued the cause for respondent Kinsley Landfill.

*Richard Hluchan* argued the cause for appellant Hancock Waste Removal (*Sterns, Herbert & Weinroth,* attorneys).

The opinion of the court was delivered by

KING, P.J.A.D.

In this case we must decide if a judicial order, based on emergency sanitation concerns, which bars any person or entity located outside the Southern New Jersey tricounty area of Salem, Gloucester and Camden Counties from using a privately-owned, state-regulated landfill (Kinsley) violates the Commerce Clause of the federal constitution. *U.S. Const. Art.* I, § 8, c. 3.[1]

We previously denied leave to appeal this interlocutory order of Judge DeSimone of the Law Division and also denied a stay of his November 13, 1984 order. Our Supreme Court and the United States Supreme Court have also denied stays of this order. However, on December 7, 1984 our Supreme Court granted the City of Philadelphia's motion for leave to appeal, remanded the matter to us for disposition of the appeal on the merits, and ordered that the appeal be accelerated. *Glassboro v. Gloucester Cty. Bd. of Chosen Freeholders,* 98 *N.J.* 186 (1984). Upon receipt of the remand order, dated December 7, 1984, we immediately scheduled and heard oral argument on December 17, 1984. Unfortunately, we did not receive the transcript of the proceedings before Judge DeSimone until February 7, 1985. Thus any more expeditious decision of this appeal was frustrated.

The order for preliminary injunction under appeal, executed by Judge DeSimone on November 13, 1984, provided in substance that

---

[1]"The Congress shall have power ... to regulate Commerce ... among the several states."

1. The Counties of Salem, Gloucester and Camden must proceed immediately to designate sites and create landfills within their respective borders which must be operational by November 1985.

2. The Kinsley Landfill in Deptford Township, Gloucester County, must cease accepting solid waste generated within the City of Philadelphia, any other Pennsylvania communities and "other out-of-district [Gloucester County] solid waste not subject to interdistrict agreements." This provision effectively excluded all solid waste originating outside of Salem, Gloucester and Camden Counties, whether from New Jersey, Pennsylvania or elsewhere.

3. All municipalities within the three counties in New Jersey were ordered to maximize recycling efforts.

4. The Kinsley Landfill was ordered closed when the capacity of an emergency 16-foot vertical expansion allowed by the court was reached. This was anticipated in November 1985.

5. Kinsley Landfill was to be closed for all sludge disposal on March 15, 1985.

Several subsequent applications by Philadelphia for modification of this order were denied. This order implemented the Department of Environmental Protection's (DEP) recommendation made in early November.

█ At the outset we note that we are satisfied that the factual underpinnings of Judge DeSimone's conclusions are well-supported by the testimony in the record and that his findings are consistent with the weight of the evidence. *See R.* 4:52–1(c); *Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 483–484 (1974); *State v. Johnson*, 42 *N.J.* 146, 161–162 (1964). We are required by our scope of review to accept his factual findings and the reasonable inferences he drew from them.

This is the way the matter developed. On October 11, 1984 defendant Kinsley Landfill, Inc., a state-regulated (*N.J.S.A.* 48:2–13) but privately-owned sanitary landfill in Gloucester County, notified its customers that it would reach the capacity permitted by its permit issued by the defendant, DEP, and would close on October 28, 1984. On October 18, 1984 the plaintiff, Borough of Glassboro, filed a verified complaint in lieu of prerogative writs and an order to show cause naming as defendants the Gloucester County Board of Chosen Freeholders, the DEP and its Commissioner, Kinsley Landfill, Inc., the

City of Philadelphia, and the County of Camden. Glassboro, which was a Kinsley customer, sought both to enjoin closure of the landfill and the use of the landfill for solid waste generated in Philadelphia, Pennsylvania and Camden County, New Jersey. Thereafter numerous parties who were customers of Kinsley intervened, including private waste haulers which served public and private entities in both New Jersey and Pennsylvania.

Judge DeSimone heard testimony on October 23, 24, 25 and 26 and rendered a decision on October 26, 1984. He found that Kinsley was quickly approaching the end of its useful life. He concluded that imminent closure would cause irreparable harm to many local municipalities dependent upon it. He also found that continued use beyond current design capacity threatened injury to the citizens of Deptford Township where the landfill is located. He concluded that a single 16-foot vertical expansion could extend, as a temporary measure, the landfill's capacity consistent with legitimate environmental concerns. This 16-foot vertical expansion would buy enough time to permit the three counties to establish new landfill sites and thus solve their impending crisis.

On the judge's order Kinsley prepared an engineering design for the vertical expansion and a plan for orderly closure which were approved by DEP in early November. In its report DEP stressed most urgently the need for Salem, Gloucester and Camden Counties to develope new landfills. DEP reported that with extraordinary effort this could be done by November 1985. DEP observed that Kinsley would be full within three and one-half months, or the end of February 1985, if the current rate of flow continued. The additional 16-foot lift could extend the life of the landfill for the one-year period needed to develop new landfills in the tricounty area, but only if the solid-waste flow to Kinsley was substantially reduced. In order to reduce the flow, DEP proposed that use of the landfill be limited to Gloucester County municipalities and to municipalities within the contiguous two counties, Camden and Salem, both of which had executed interdistrict waste flow agreements with Glouces-

ter County.[2]   Moreover, the DEP report noted that any communities using Kinsley must be ordered to maximize recycling efforts.

We agree with Judge DeSimone that this is the very type of situation which the Legislature foresaw, intended to address and hoped to avoid when it enacted the Solid Waste Management Act, *N.J.S.A.* 13:1E–1 *et seq.*, *L.*1970, *c.* 39, effective May 6, 1970, and noted that the collection of solid waste was "a matter of grave concern to all citizens." *Id.* at § 2.   As the record here amply shows, this "grave concern" noted in 1970 had ripened to a potentially imminent catastrophe in the tricounty area by November 1984.   Action was necessary.   The only available local landfill to the tricounty area was Kinsley which would "reach its design capacity in a matter of days" from the conclusion of the hearing on October 26, that is between November 10 and 14, if nothing was done.   The so-called "ten-year plan" originally conceived to permit Kinsley to operate routinely until 1988, when resource recovery technology became available, had collapsed because of increased flow, much of it from outside of New Jersey.

The general background concerning the solid waste problem in this State over the past 15 years was outlined by the Supreme Court in the decision and order denying appellant's application for a stay in this case.   98 *N.J.* 186.   He said.

> The Order that is the subject of these applications must be examined in the light of the critical Statewide concerns relating to solid waste disposal, noted as early as 1974 by this Court in *Southern Ocean Landfill v. Mayor of Ocean Tp.*, 64 *N.J.* 190, 193, and again, eight years later, in *A.A. Mastrangelo, Inc. v. Environmental Protection Dept.*, 90 *N.J.* 666 (1982).   In particular, the order must be viewed within the framework of *N.J.S.A.* 13:1E–1 to –38, the Solid Waste Management Act.   This Act was passed by the Legislature in recognition of the fact that the management of solid waste disposal in New Jersey had consisted largely of haphazard, random, uncoordinated activities undertaken with little, if any, regard for regional planning and coordination.   *N.J.S.A.*

---

2 Two small townships in Gloucester County, Elk and East Greenwich, still have capacity at their municipally-owned landfills which they must exhaust before they can resort to Kinsley.

13:1E–2a. In order to protect the public health, safety,. and welfare, the Act establishes the policy of New Jersey to provide a coordinated approach to solid waste disposal by establishing 22 solid waste management districts (consisting of 21 counties and the Hackensack Meadowlands district), each of which is charged with the responsibility of developing and implementing comprehensive solid waste management plans that meet solid waste disposal needs. *N.J.S.A.* 13:1E–2b(2). [*Id.* at 191–192].

\*  \*  \*  \*  \*  \*  \*  \*

The Solid Waste Management Act contemplates that when solid waste is transported into a solid waste management district it must be pursuant to an interdistrict agreement. *N.J.S.A.* 13:1E–21b(3). According to the Department, a district cannot effectively plan for the solid waste disposal facilities that are needed to meet waste disposal needs unless it knows how much waste will be entering the district from various sources. While an out-of-state waste generator cannot be compelled to enter into such an agreement, it is entirely reasonable to authorize such generators to enter into appropriate contractual arrangements that will serve to further comprehensive planning and regulation. [*Id.* at 192–193].

\*  \*  \*  \*  \*  \*  \*  \*

Congress itself has recognized the need for the development of comprehensive state plans for solid waste disposal and implicitly this requires the planned management of waste flow. *See,* Resource Conservation and Recovery Act of 1976, 42 *U.S.C.A.* §§ 6901–6987. Congress has there expressed a strong policy preference for resource recovery. *See* 42 *U.S.C.A.* § 6941. Resource recovery cannot be accomplished if waste streams are not directed. *See Central Iowa Refuse Systems, Inc. v. Des Moines Metro. Solid Waste,* 715 *F.*2d 419 (8th Cir.1983) (restraint on waste flows essential to development of comprehensive waste flow plan). The court order here recognizes local responsibilities in this area, responsibilities that clearly require integrated planning. *See A.A. Mastrangelo, Inc. v. Environmental Protection Dept.,* 90 *N.J.* 666 (1982) (two state agencies have concurrent responsibilities to direct the interdistrict flow of waste); *In re Application of Combustion Equipment Associates,* 169 *N.J.Super.* 305 (App.Div.1979). [*Id.* at 194].

*See also* Maltz, "How Much Regulation is Too Much—An Examination of Commerce Clause Jurisprudence," 50 *Geo Wash.L.Rev.* 47, 72–74 (1981); Note, "Garbage, The Police Power, and the Commerce Clause; City of Philadelphia v. New Jersey," 8 *Cap.U.L.Rev.* 613 (1979); Note, "The Commerce Clause and Interstate Waste Disposal; New Jersey's Option After the Philadelphia Decision," 11 *Rut.Cam.* 31 (1979).

We are convinced that Judge DeSimone's order of November 13 withstands federal constitutional scrutiny for several

reasons. We think that this situation has passed beyond the dimension of the everyday, business-as-usual commerce between the several states envisioned by *Philadelphia v. New Jersey*, 437 *U.S.* 617, 624, 98 *S.Ct.* 2531, 2535, 57 *L.Ed.*2d 475 (1978) (New Jersey statute barring all out-of-state waste held unconstitutional). The judge here was confronted with an imminent public health and welfare crisis, probably more compelling and dangerous than the local burdens on commerce historically tolerated, as shown by the "quarantine" cases. *See Asbell v. Kansas*, 209 *U.S.* 251, 28 *S.Ct.* 485, 52 *L.Ed.* 778 (1908); *Reid v. Colorado*, 187 *U.S.*137, 23 *S.Ct.* 92, 47 *L.Ed.* 108 (1902); *Baldwin v. G.A.F. Sellig, Inc.*, 294 *U.S.* 511, 525, 55 *S.Ct.* 497, 501, 79 *L.Ed.* 1032 (1934); *Bowman v. Chicago & Northwestern R. Co.*, 125 *U.S.* 466, 491, 8 *S.Ct.* 689, 701, 31 *L.Ed.* 700 (1888). The judge here was not concerned with "the clamors of an impatient avidity for immediate and immoderate gain" against which James Madison as Publius inveighed in 1788. *The Federalist No. 42.* The judge was concerned with imminent considerations of public health and safety in the tricounty area of about 700,000, not with economic protection of local industry. Coincidentally, we find it interesting that the "tipping fee" at Kinsley has more than tripled since the entry of Judge DeSimone's order in November 1984. On January 7, 1985, the Board of Public Utility increased the tariff from $2.85 to $10 per-cubic-yard in order to accommodate the long-range costs of an environmentally sound closure. *N.J.Evid.R.* 9(2)(a). These closure costs, $7.47 per cubic yard, which ideally should have been accumulated throughout the life of the landfill through charges on both local and interstate users, must now be paid by local users. *N.J.S.A.* 13:1E–100, –116.

Philadelphia and other Pennsylvania communities had generated about 60% of the trash-flow to Kinsley. But only about 50% of all of Philadelphia's solid waste was sent to Kinsley. The City of Philadelphia has had no landfill within its borders since 1978. The record clearly shows that Philadelphia had the equipment and logistical capacity to route its solid waste else-

where than Kinsley but that the 59 much smaller governmental entities in the New Jersey tricounty area had no feasible alternative to Kinsley because they lacked equipment and other resources to meet the imminent sanitary threat. The record demonstrates that the economic impact of the emergency order issued by Judge DeSimone was only modestly adverse to Philadelphia's Streets' Department budgeted item for this service; about 5% increase which would decrease to 2% after the first year. (Four million of a $91 million annual Streets' Department budget for the first year). Philadelphia's population is about 1.7 million. The economic effect on the 59 local municipalities dependent on Kinsley would have been enormous, assuming indeed there was any possible alternative to the order. Glassboro's budget for solid waste disposal could escalate from $100,000 to $1,000,000 per year for a town of 14,500. Some towns, such as Clayton, Elmer and Woodstown had no alternative to their present private-hauler service if Kinsley were closed without access to an alternate local source. The private haulers would simply close down. There was credible evidence before the judge that Camden County's cost could rise from $3 million annually to greater than $12 million annually. Camden County has a population of about 500,000. We conclude that Judge DeSimone, in reality, had no choice in the matter but to act as he did to insure public safety. If our conclusion is soundly based, the constitutional arguments raised by appellants fail of necessity.

This temporary remedy, designed to prevent irreparable harm in the form of a public-health crisis, derived from a proper balance of the equities whether conceived as the relative degree of hardship facing the local municipalities if no action were taken or the relative ability of waste generators outside of the tricounty area to cope with the judicial remedy imposed. *See Crowe v. DeGioia*, 90 *N.J.* 126, 134 (1982). This judicial order was not the blanket state-wide legislation precluding access for all time to New Jersey's solid-waste disposal sites to outsiders which was found constitutionally repugnant in *Philadelphia v.*

*New Jersey, supra.* This was a carefully-crafted judicial order, balanced and molded to address only the evil of the day, not to throttle to perpetuity by economic discrimination any particular kind of commerce within or between the states.

We hold that the lost access by Philadelphia and others to the Kinsley site for one year was not a "clearly excessive" concern for local interests in comparison to the "substantial state interest ... in easing solid waste disposal problems." *Minnesota v. Clover Leaf Creamery Co.*, 449 *U.S.* 456, 473, 101 *S.Ct.* 715, 729, 66 *L.Ed.*2d 659 (1981). Even in *Philadelphia v. New Jersey*, 437 *U.S.* at 624, 98 *S.Ct.* at 2535, urged on us as controlling authority by Philadelphia, the Supreme Court observed its understanding "that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people." Moreover, but for the judge's order crafted to confront this health emergency, Kinsley would now be closed, because it would have reached its design limits; Philadelphia would have no access, nor would anyone else. We would have left only a public-health crisis in New Jersey. We do not think that the Constitution compels such fatalism.

While recently addressing interstate control of ground water, the United States Supreme Court clearly acknowledged its "reluctan[ce] to condemn as unreasonable measures taken by a State to conserve and preserve for its own citizens this vital resource in times of severe shortage." *Sporhase v. Nebraska ex rel. Douglas*, 458 *U.S.* 941, 956, 102 *S.Ct.* 3456, 3464, 73 *L.Ed.*2d 1254 (1982). The Court also said: "A State's power to regulate the use of water in times and places of shortage for the purpose of protecting the health of its citizens—and not simply the health of its economy—is at the core of the police power. For Commerce Clause purposes, we have long recognized a difference between economic protectionism on the one hand, and health and safety regulation on the other." *Ibid.* In *Sporhase* Justice Stevens, speaking for the Court, was not persuaded that Nebraska's restrictive statute was "narrowly

tailored to serve" a legitimate local purpose. *Id.* at 958, 102 *S.Ct.* at 3465. Here the record abundantly shows that Judge DeSimone's order indeed was "narrowly tailored" in duration, location and neutrality of preclusion, as the Constitution compels, to meet the emergency needs of our citizens until new waste disposal sites could be established. *See also Pike v. Bruce Church, Inc.,* 397 *U.S.* 137, 142, 90 *S.Ct.* 844, 847, 25 *L.Ed.*2d 174 (1970); *Tribe, American Constitutional Law,* § 6-6 at 329-330 (1978). Judge DeSimone, by approving the new 16-foot vertical lift, ordered Kinsley to accept new waste beyond the previously-determined environmentally-sound and lawful disposal capacity of the landfill but only to assure local health concerns, not to enhance provincial economic interests.

As noted, a key element of this State's planning process is the requirement of interdistrict agreements to govern the flow of solid waste. *N.J.S.A.* 13:1E-21b(3). This enables the county to know where the waste will be coming from and in what quantity. The judge found that Philadelphia, contending until almost the end for an absolute right of access to Kinsley free from any environmental planning responsibility, never entered into any interdistrict agreement or other contract with Gloucester County. Camden and Gloucester County both entered into these agreements. He specifically found that Gloucester County officials negotiated in good faith in an attempt to obtain a waste-flow agreement or contract. Philadelphia refused to reduce its flow voluntarily to 1981 levels and adopt verifiable recycling efforts until quite late in this scenario.[3] Indeed, the judge found that Philadelphia's flow "continued to escalate at an alarming rate unlike those [New Jersey] districts subject to interdistrict agreements." He also found the burden on interstate commerce presented by a waste-flow agreement or contract requirement to be minimal "in light of the same

---

[3]In *Philadelphia v. New Jersey,* 437 *U.S.* at 626, 98 *S.Ct.* at 2536, Justice Stewart said that New Jersey may protect its environment "by slowing the flow of all waste into the State's remaining landfills."

burden being placed on in-state districts." We recently made these observations in *City of Elizabeth v. DEP*, 198 *N.J.Super.* 41, 50 (App.Div.1984),

> Appellant Ocean County Landfill contends, additionally, that to the extent the regulation limits it to receiving waste generated from within Ocean County, it excludes waste from out-of-state in violation of the Commerce Clause of the Federal Constitution. *See City of Philadelphia v. State of New Jersey*, 437 U.S. 617 [98 *S.Ct.* 2531, 57 *L.Ed.*2d 475] (1978). The point missed by this argument, however, is that the regulation does not preclude the importation of waste into New Jersey. It merely designates the disposal sites available to specific solid waste generating districts. The regulation was not adopted in furtherance of "protectionist" policies and it does address a matter of legitimate local concern, that is, avoiding the excessive concentration of solid waste in areas with inadequate disposal capacities.

In any event, our decision does not turn on the presence or absence of a waste-flow agreement or contract between Gloucester County and Philadelphia, but on the reality that a very finite resource can be used temporarily in a parochial way to avoid public peril, without offending the federal constitution.

The United States Supreme Court last term considered a claim that the Privileges and Immunities Clause,[4] which has a common historical origin with the Commerce Clause,[5] conferred the absolute right to employment on public works projects equally upon in-state and out-of-state residents, despite the claim of dire local employment conditions which the City of Camden sought to remedy by a 40% employment "set aside" for Camden residents. *United Bldg. & Constr. Trades v. Mayor*, —— *U.S.* ——, 104 *S.Ct.* 1020, 79 *L.Ed.*2d 249 (1984). Writing for the Court, Justice Rehnquist concluded that the right to employment indeed was fundamental and protected by the Privileges and Immunities Clause. But the right was not

---

[4]*U.S. Const.* Art. IV, § 2, c. 1.

[5]The Privileges and Immunities Clause and the Commerce Clause have a common origin in Art. IV § 2 of the Articles of Confederation and share the common purpose of national unity. Note, "Solving New Jersey's Solid Waste Problem Constitutionally", 32 *Rut.L.Rev.* 741, 749–750 n. 50 (1979); *see Hicklin v. Orbeck*, 437 *U.S.* 518, 531–532, 98 *S.Ct.* 2482, 2490, 57 *L.Ed.*2d 397 (1978).

absolute, overriding all legitimate local concerns. The City of Camden contended that its "set aside" ordinance was "necessary to counteract grave economic and social ills," 104 *S. Ct.* at 1030, 79 *L.Ed.*2d at 261, *i.e.*, spiralling unemployment, a sharp decline in population, dramatic reduction in local businesses, eroded property values and a depleted tax base. Camden contended that the ordinance was "carefully tailored" to alleviate these evils. The Court remanded to permit Camden to create a record to prove its claims of "grave economic and social ills." If so justified, the "set aside" ordinance could survive constitutional attack notwithstanding its discriminatory employment feature in favor of local residents. Justice Rehnquist noted that the constitutional inquiry must be "conducted with due regard for the principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures," 104 *S. Ct.* at 1030, 79 *L.Ed.*2d at 261, citing *Toomer v. Witsell*, 334 *U.S.* 385, 68 *S. Ct.* 1156, 92 *L.Ed.* 1460 (1948). By analogy to the Camden case, we find no constitutional infirmity in the order before us for review because the local health and welfare emergency, perceived as a veritable "doomsday" and an "horrendous specter," as found by Judge DeSimone and as supported by the record, required some accommodation of local interests during the waning days of this landfill. Over the life of this landfill, since the 1950's, Philadelphia, and indeed all generators outside of the tricounty area, had enjoyed unlimited access to Kinsley up until November 13, 1984. In that context, the judicial order bars users from outside the tricounty area for only about 3% of the temporal life of the landfill. And that one year or 3% is available only because of the emergency judicial order extending the original environmental life expectancy. We deem this minimal local burden imposed on interstate commerce for bona fide public safety concerns a constitutionally acceptable imposition. As the cases state, at a certain point in matters involving public safety, Commerce Clause considerations must yield to the police power. Where that point lies on any given scale of values calls

for delicate judgment and due consideration for the sanctity of our Union and the federal system, as well as for local concerns. Our review of this matter persuades us that Judge DeSimone's order has respected that delicate balance in this most difficult situation. A bright constitutional line may certainly blur at points but where the burden is only temporary and adversely affects both New Jersey interests beyond the tricounty area and Pennsylvania interests, we cannot say his call was wrong.

We must stress that the order of Judge DeSimone in effect forecloses use of the landfill by both in-state and out-of-state users beyond the tricounty area. The order does not bar Philadelphia's trash simply because of its Pennsylvania origin but because of its origin outside the emergently-affected tricounty, Southern New Jersey area. Waste originating from Atlantic City, Trenton, Newark or the State of Delaware, or any other source outside of the tricounty area was banned.[6]

In conclusion, we observe that the private haulers serving Pennsylvania and other excluded sources of waste who intervened on this appeal and who presented their constitutional arguments and overall objections to Judge DeSimone's preclusive order have been accorded due process. We conclude that their counsels' full participation on this appeal satisfies any due process concerns which might be raised on the grounds that they may not have participated fully in the Law Division. We conclude that for all purposes relevant to the issues raised on this appeal, all private haulers serving customers beyond the tricounty area have interests identical with Philadelphia. The dispositive issue here turns on the source of waste coming from outside the tricounty area and the emergent character of the

---

[6]Other New Jersey sources than Camden, Salem and Gloucester Counties accounted for 6.1% of waste dumped at Kinsley. The record shows that there was New Jersey waste originating from 13 counties outside the tricounty area coming to Kinsley. This waste is now barred as a result of the neutral prohibition contained in the court's exclusionary order directed to all nonsignatories of interdistrict agreements.

situation in that region confronting the judge. The particular identity of any private or public hauler or its waste sources outside of the tricounty area is irrelevant to our disposition. We are basically concerned with the flow of waste into Kinsley, not any particular point of origin.

Affirmed.