BOROUGH OF GLASSBORO, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND THE BOARD OF HEALTH OF THE BOROUGH OF GLASSBORO, PLAINTIFFS-RESPONDENTS, AND BOROUGH OF CLAYTON, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND TOWNSHIP OF MONROE, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFFS-INTERVENORS-RESPONDENTS, v. GLOUCESTER COUNTY BOARD OF CHOSEN FREEHOLDERS AND THE COUNTY OF CAMDEN, DEFENDANTS, AND NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, ROBERT E. HUGHEY, COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, AND KINSLEY LANDFILL, INC., DEFENDANTS-RESPONDENTS, AND THE CITY OF PHILADELPHIA, DEFENDANT-APPELLANT, AND TOWNSHIP OF DEPTFORD, DEFENDANT-INTERVENOR-RESPONDENT.

Argued May 7, 1985—Decided July 10, 1985.

136

*Barbara W. Mather,* City Solicitor, a member of the Pennsylvania bar, argued the cause for appellant (*Tomar, Parks, Seliger, Siminoff & Adourian,* attorneys; *Steven K. Kudatzky* and *James Katz,* of counsel and on the brief).

*Joseph F. Lisa* argued the cause for respondents Borough of Glassboro, etc., et al. and intervenors-respondents Borough of Clayton, etc., et al.

*Paul H. Schneider,* Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection, et al. (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Michael R. Cole,* First Assistant Attorney General, of counsel).

*Timothy S. Haley* argued the cause for intervenor-respondent Township of Deptford (*Gordon & Gordon,* attorneys).

*Charles C. Carella* submitted a brief on behalf of respondent Kinsley Landfill, Inc. (*Carella, Byrne, Bain & Gilfillan,* attorneys; *Charles C. Carella* and *Brendan T. Byrne,* of counsel and on the brief).

The opinion of the Court was delivered by

POLLOCK, J.

On this appeal, the City of Philadelphia (Philadelphia) asks us to review a preliminary injunction closing the Kinsley Landfill in Deptford Township, Gloucester County. Seven months ago, we denied Philadelphia's request for a stay of the injunction. 98 *N.J.* 186 (1984). Thereafter, a single United States Supreme Court Justice also denied Philadelphia's request for a stay.

In the present appeal, as in its former application, Philadelphia contends that the injunction, which permits certain New Jersey municipalities to use the landfill as an emergency health measure, imposes an impermissible burden on interstate com-

merce. Specifically, Philadelphia contends that the closure order violates the Commerce Clause of the federal constitution, *U.S. Const.* art. I, § 8, cl. 3. Impressed with the public health emergency that confronted the trial court, the Appellate Division affirmed the injunction. 199 *N.J.Super.* 91 (1985). We affirm the judgment of the Appellate Division.

I

Kinsley Landfill, Inc. (Kinsley) is a privately-owned landfill that is subject to regulation by the New Jersey Department of Environmental Protection (DEP) as to environmental concerns and by the Board of Public Utility Commissioners (BPU) as to economic matters. For approximately twenty-five years, Kinsley has operated as a major solid waste disposal site in southern New Jersey. On September 26, 1980, DEP issued a permit authorizing the dumping of solid waste at the landfill to a height of 164 feet. By the spring of 1984, garbage had accumulated nearly to the approved limit. Virtually all the solid waste generated within New Jersey that is deposited at the landfill emanates from Gloucester, Camden, and Salem counties (hereinafter described sometimes as "the three counties").

On October 11, 1984, Kinsley notified its customers that it would soon reach the 164-foot limit and that it would close on October 28, 1984. Shortly thereafter, the Borough of Glassboro (Glassboro), one of the municipalities disposing of solid waste at Kinsley, instituted this action to enjoin both the closure of the landfill and the use of the landfill for solid waste originating in Philadelphia. The defendants included Philadelphia, Deptford Township, and DEP. Various other parties were joined or have intervened in the proceedings.

The trial court conducted hearings over several days on Glassboro's request for a temporary restraining order. On October 26, 1984, two days before the announced closure of the landfill, the court rendered its decision and issued the order. The court found that Kinsley was rapidly approaching the end

of its useful life and that it should be closed. Although it recognized that continued use beyond the current design threatened the health and safety of the citizens of Deptford, the court found that immediate closure would cause irreparable harm to the citizens of Glassboro and certain other municipalities. The court concluded that the most equitable response was to restrain the closure and direct Gloucester County to establish "a reasonable site for alternate solid waste disposal." The court reserved decision on the application for restraints against Philadelphia.

Pursuant to a suggestion made by Kinsley's engineer, the court ordered Kinsley to submit to DEP engineering plans for an additional sixteen-foot lift, one that would expand the height of the landfill to 180 feet. In accordance with the court order, DEP reviewed the plans and submitted a report for the court's consideration in connection with the application for a preliminary injunction.

The report cited, among other things, that no acceptable alternate landfill existed in New Jersey for the disposal of solid waste dumped at Kinsley. Consequently, the three counties should expeditiously site and implement landfills within their respective borders. Although DEP procedures for opening a landfill ordinarily take two years, DEP would process the applications on an emergent basis, and the counties could open alternate landfills by November 1985. In the interim, Kinsley could accommodate a sixteen-foot vertical expansion.

At the hearing on the application for the order under review, the court accepted the DEP report in its entirety and, consistent with that report, made certain findings. We accept those findings and the inferences that the trial court drew from them as supported by substantial credible evidence. *Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 483–84 (1974). Most importantly, the trial court found that at then current levels of dumping at Kinsley, the additional capacity created by the sixteen-foot lift would be reached in three and one-half months.

Most of the solid waste formerly dumped at the landfill emanated from Pennsylvania, with Philadelphia alone providing 53.9% of the 4,738,783 cubic yards of waste dumped in the period from July 1, 1983 to May 31, 1984. According to waste flow registration statements filed by Philadelphia with DEP, this volume represents a dramatic increase over Philadelphia's prior use of the landfill. In 1981–82, for example, Philadelphia disposed of 784,770 cubic yards of waste at Kinsley, and, in 1982–83, this figure grew to 1,136,785 cubic yards. Accordingly, the trial court found that the disposal of waste by Philadelphia at the landfill had "continued to escalate at an alarming rate unlike those districts subject to interdistrict agreements."

Furthermore, since 1980, DEP had required that Philadelphia, like the adjoining New Jersey counties, sign an interdistrict waste flow agreement with Gloucester as a condition of continued use of the Kinsley Landfill. Notwithstanding DEP's urging, Philadelphia had not executed an interdistrict agreement, the basic instrument under the Solid Waste Management Act, *N.J.S.A.* 13:1E–1 to –38, for planning for the disposal of solid waste generated outside a district such as Gloucester County. Rejecting one of Philadelphia's contentions, the court found that Gloucester County had negotiated with Philadelphia in good faith.

Also consistent with the DEP report, the trial court found that Philadelphia, unlike the municipalities in the tri-county area, could accommodate the closure of the Kinsley Landfill. Even when Kinsley was operating under a DEP permit, Philadelphia sent half of its garbage elsewhere. Philadelphia not only enjoys access to alternative sites, but also to equipment for routing its solid waste elsewhere. In contrast, the tri-county municipalities do not own the trucks, transfer stations, or resources necessary for dumping at more distant sites. As the Appellate Division recited, fifty-nine municipalities in the tri-county area had no alternative to Kinsley. 199 *N.J.Super.* at 100.

In view of these findings, the trial court decided that the most equitable result was to exclude from Kinsley solid waste originating from Philadelphia and from other municipalities, both within and without New Jersey. The result of that decision was to extend the life of the landfill for one year, the time needed by the three counties to establish alternative sites.

Consequently, on November 13, 1984, the court issued a preliminary injunction providing, in effect, that:

(1) Municipalities in Gloucester, Camden, and Salem counties could continue to use Kinsley to dispose of solid waste for an additional sixteen-foot lift. The three counties must proceed immediately, within their respective borders, to establish landfills, which are to be operational by November 1985. (As the Appellate Division noted, 199 *N.J.Super* at 97, two Gloucester municipalities must exhaust the capacity at their municipally-owned landfills before they can resort to Kinsley. *See N.J.A.C.* 7:26–6.5h, 2, 3, 4.)

(2) Kinsley was to cease accepting solid waste generated within Philadelphia, other Pennsylvania communities, and any other district outside of Gloucester County that is not subject to an interdistrict agreement.

(3) All communities using Kinsley should be required "to maximize" their recycling efforts, including the adoption of mandatory recycling ordinances and curbside pickup.

(4) When the sixteen-foot vertical expansion was reached, Kinsley was to close, at which time waste was to be redirected to the landfills. This was expected to occur by November 1985.

(5) Kinsley was to be closed for all sludge disposal on March 15, 1985.

Understanding the legal significance of the preceding facts begins with the recognition that New Jersey is in the throes of a solid waste crisis. In our earlier decision reviewing the injunctive order, we summarized the background of that crisis:

The Order that is the subject of these applications must be examined in the light of the critical Statewide concerns relating to solid waste disposal, noted as early as 1974 by this Court in *Southern Ocean Landfill v. Mayor of Ocean Tp.*, 64 *N.J.* 190, 193, and again, eight years later, in *A.A. Mastrangelo, Inc. v. Environmental Protection Dep't*, 90 *N.J.* 666 (1982). In particular, the Order must be viewed within the framework of *N.J.S.A.* 13:1E–1 to –38, the Solid Waste Management Act. This Act was passed by the Legislature in recognition of the fact that the management of solid waste disposal in New Jersey had consisted largely of haphazard, random, uncoordinated activities undertaken with little, if any, regard for regional planning and coordination. *N.J.S.A.* 13:1E–2a. In order to protect the public health, safety, and welfare, the Act establishes the policy of New Jersey to provide a coordinated approach to solid waste disposal by establishing 22 solid waste management districts (consisting

of 21 counties and the Hackensack Meadowlands district), each of which is charged with the responsibility of developing and implementing comprehensive solid waste management plans that meet solid waste disposal needs. *N.J.S.A.* 13:1E–2b(2). [98 *N.J.* at 191–92.]

\*     \*     \*     \*     \*     \*     \*     \*

The Solid Waste Management Act contemplates that when solid waste is transported into a solid waste management district it must be pursuant to an interdistrict agreement. *N.J.S.A.* 13:1E–21b(3). According to the Department, a district cannot effectively plan for the solid waste disposal facilities that are needed to meet waste disposal needs unless it knows how much waste will be entering the district from various sources. [*Id.* at 192–93.]

The Appellate Division likewise recognized the importance of planning and the vital role of interdistrict agreements in gaining control of the solid waste crisis. 199 *N.J.Super.* at 97–98. Nonetheless, that court did not rest its decision on the absence of an agreement with Philadelphia, *id.* at 103, but on the existence of an "imminent public health and welfare crisis," *id.* at 99. In affirming the order permitting the temporary use of the landfill to avert a public health crisis, the Appellate Division concluded that the trial court had struck a proper balance of the equities. *Id.* at 100. It remains for us to determine whether the order under review is consistent with the mandate of the Commerce Clause.

## II

The Commerce Clause provides simply that: "The Congress shall have Power \* \* \* to regulate Commerce \* \* \* among the States." When Congress has not exercised its preemptive power, many subjects affecting interstate commerce, particularly those of local concern, remain subject to state control. *See Sporhase v. Nebraska,* 458 *U.S.* 941, 954, 102 *S.Ct.* 3456, 3463, 73 *L.Ed.*2d 1254, 1264 (1982); *Hunt v. Washington Apple Advertising Comm'n,* 432 *U.S.* 333, 349–50, 97 *S.Ct.* 2434, 2444–45, 53 *L.Ed.*2d 383, 398–99 (1977). Although Congress has enacted legislation pertaining to solid waste, 42 *U.S.C.A.* §§ 6901–87, it has not preempted, but rather encouraged, state regulation of interstate waste. *See*

*Philadelphia v. New Jersey*, 437 *U.S.* 617, 620 n. 4, 98 *S.Ct.* 2531, 2533 n. 4, 57 *L.Ed.*2d 475, 479 n. 4 (1978).

■ When confronted with congressional silence, states remain constrained, nonetheless, by the "dormant" character of the Commerce Clause. *Wilson v. Black Bird Creek Marsh Co.*, 27 *U.S.* 412 (2 *Pet* 245), 7 *L.Ed.* 412 (1829); *see* G. Gunther, *Constitutional Law* 278–80 (1975). In its dormant state, the Commerce Clause acts as a "self-executing limitation on the power of the States to enact laws imposing substantial burdens on [interstate] commerce." *South Central Timber Dev., Inc. v. Wunnicke*, 467 *U.S.* 82, ——, 104 *S.Ct.* 2237, 2240, 81 *L.Ed.* 2d 71, 76 (1984); *Hughes v. Oklahoma*, 441 *U.S.* 322, 326, 99 *S.Ct.* 1727, 1731, 60 *L.Ed.*2d 250, 255–56 (1979).

■ As a general proposition, a state regulation will be sustained if it is rationally related to a legitimate state end and if the state interest in enforcing the regulation outweighs the burden on interstate commerce. L. Tribe, *American Constitutional Law* § 6–5, at 326 (1978). Thus, Commerce Clause analysis often involves balancing the national need for the free flow of trade with the local concern of individual states to protect the health, safety, and welfare of their citizens. Nowhere is that balance more critical than in weighing the national interest against the substantial local interest in the proper disposal of solid waste. *Minnesota v. Clover Leaf Creamery Co.*, 449 *U.S.* 456, 471, 473, 101 *S.Ct.* 715, 728, 66 *L.Ed.*2d 659, 673, 675 (1981), *reh'g denied*, 450 *U.S.* 1027, 101 *S.Ct.* 1735, 68 *L.Ed.*2d 222 (1981).

■■ At the outset, we must determine which of two standards applies to our appraisal of the effect of the injunction on interstate commerce. The first standard, applicable when a state regulation manifests simple economic protectionism, results in a virtual *per se* rule of invalidity. *Minnesota v. Clover Leaf Creamery Co.*, *supra*, 449 *U.S.* at 471, 101 *S.Ct.* at 727; *Philadelphia v. New Jersey*, *supra*, 437 *U.S.* at 624, 98 *S.Ct.* at 2535, 57 *L.Ed.*2d at 481. Economic protectionism has been

proved by establishing that a statute has either a discriminatory purpose, *Hunt v. Washington Apple Advertising Comm'n, supra,* 432 *U.S.* 333, 97 *S.Ct.* 2434, 53 *L.Ed.*2d 383, or a discriminatory effect, *Philadelphia v. New Jersey, supra,* 437 *U.S.* 617, 98 *S.Ct.* 2531, 57 *L.Ed.*2d 475. The initial burden to demonstrate discrimination rests with the party attacking the state regulation. *Hughes v. Oklahoma, supra,* 441 *U.S.* at 336, 99 *S.Ct.* at 1736, 60 *L.Ed.*2d at 262. Once discrimination is shown to exist, however, the burden falls on the state to justify the regulation both in terms of the local benefits it provides and the unavailability of nondiscriminatory alternatives. *Id.* (quoting *Hunt v. Washington Apple Advertising Comm'n, supra,* 432 *U.S.* at 353, 97 *S.Ct.* at 2446, 53 *L.Ed.*2d at 400); *see Sporhase v. Nebraska, supra,* 458 *U.S.* at 957, 102 *S.Ct.* at 3464, 73 *L.Ed.*2d at 1266–67; *U.S.A. Chamber of Commerce v. State,* 89 *N.J.* 131, 162 (1982).

■ A second, more flexible, standard applies when a state regulation advances legitimate local interests and does not facially discriminate against interstate commerce:

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. [*Pike v. Bruce Church, Inc.,* 397 *U.S.* 137, 142, 90 *S.Ct.* 844, 847, 25 *L.Ed.*2d 174, 178 (1970) (citation omitted).]

*See Minnesota v. Clover Leaf Creamery Co., supra,* 449 *U.S.* at 471, 101 *S.Ct.* at 727; *Philadelphia v. New Jersey, supra,* 437 *U.S.* at 624, 98 *S.Ct.* at 2535. We discern some overlap in the application of the two standards. In determining whether a state regulation is discriminatory in purpose or effect, for example, we consider some of the same factors involved in determining whether a local concern is genuine and whether the regulation operates evenhandedly. Our initial task is to determine whether the injunction is, as Philadelphia contends, "bla-

tantly discriminatory and protectionist on its face and in its effects," or whether it operates evenhandedly to advance the legitimate local interests of the three counties. *See Hughes v. Oklahoma, supra*, 441 *U.S.* at 336, 99 *S.Ct.* at 1736, 60 *L.Ed.*2d at 262.

In making that determination, we must consider the purpose of the injunction and its effect on interstate commerce. Its purpose is to permit emergency access to Kinsley for the protection of the health, safety, and welfare of a limited number of municipalities in the tri-county area that have no alternative means of disposing of solid waste. Although the injunction permits those municipalities to avail themselves of Kinsley, they may do so only on an emergent basis and only by assuming, together with the three counties, substantial obligations. For example, the three counties must establish alternative sites within a year, a timetable that requires accelerated efforts by both DEP and those counties. In addition, all municipalities using Kinsley must make maximum efforts to recycle disposable waste, including curbside pickup. Furthermore, the BPU has increased the "tipping fees" (the amount paid to dump) at Kinsley from $2.85 to $10 per-cubic-yard to accommodate the costs of an environmentally-sound closure, estimated at $7.47 per-cubic-yard. See BPU Interim Order, Docket No. 8411–1205, In re matter of the Petition of Kinsley's Landfill, Inc. (Jan. 7, 1955). Thus, the municipalities have incurred a three-fold cost increase to continue dumping at Kinsley. Stated plainly, the purpose of the injunction is to borrow a few extra months from a virtually exhausted resource, a landfill that would otherwise be closed. In effect, the injunction treats Philadelphia like the thirteen New Jersey counties that formerly used Kinsley.

To support its argument that the injunction discriminates against interstate commerce, Philadelphia relies on *Philadelphia v. New Jersey, supra*, 437 *U.S.* 617, 98 *S.Ct.* 2531, 57 *L.Ed.*2d 475, in which the United States Supreme Court reviewed a statute that, with narrow exceptions, excluded from New Jersey all out-of-state waste. The effect of the statute

was to prevent Philadelphia from sending its garbage anywhere in New Jersey. In a divided opinion, the Supreme Court found that the statute violated the Commerce Clause. 437 *U.S.* 617, 98 *S.Ct.* 2531, 57 *L.Ed.*2d 475. Although New Jersey defended the statute as an environmental protection measure, Justice Stewart declared that whether the statutory objective was to reduce waste disposal costs or to protect open land from pollution, the State could not achieve its objective by discriminating against interstate commerce. *Id.* at 626–27, 98 *S.Ct.* at 2536–37, 57 *L.Ed.*2d at 483. He observed, however, that a statute regulating the flow of articles of commerce might be upheld when there was "some reason, apart from their origin, to treat them differently." *Id.* at 627, 98 *S.Ct.* at 2537, 57 *L.Ed.*2d at 483; *cf. United Bldg. & Constr. v. Mayor & Council of Camden,* 465 *U.S.* 208, ——, 104 *S.Ct.* 1020, 1029–30, 79 *L.Ed.*2d 249, 261–62 (1984) (under Privilege and Immunities clause, municipality may discriminate against out-of-state residents on its construction projects "where there is a 'substantial reason' for the difference in treatment").

Consistent with that observation, several reasons compel the conclusion that the place of origin is unrelated to the injunction against the continued dumping of Philadelphia garbage at Kinsley. Here, we are not confronted with a ban on all out-of-state garbage as we were in *Philadelphia v. New Jersey.* Thirteen New Jersey counties, which account for approximately 6.1% of the waste disposed of at Kinsley, also are excluded. Furthermore, that Philadelphia, as the biggest former customer, may feel the burden more heavily does not vitiate the substantial interest of New Jersey in protecting the health of Salem, Gloucester, and Camden counties. *Minnesota v. Clover Leaf Creamery Co., supra,* 449 *U.S.* at 473, 101 *S.Ct.* at 728, 66 *L.Ed.*2d at 678. If no state line existed between New Jersey and Pennsylvania, we would uphold the injunction as a valid exercise of the powers of a court of equity. As an equitable remedy, the decree merely preserves space at Kinsley for certain municipalities that, as a practical matter, do not have

access to other landfills, while remitting other municipalities, including Philadelphia, to alternative sites. Additional garbage from any source, either within or outside New Jersey, will displace space at Kinsley needed to avert a health crisis in the three counties. In avoiding that crisis, the injunction also effectuates the legislative and regulatory scheme for the disposal of solid waste.

The mere fact that Philadelphia is in another state should not imbue it with greater rights than it would possess if it were located in New Jersey. The Commerce Clause was intended as a shield against discrimination, not as a sword to obtain a preference. We conclude that the injunction is not discriminatory in purpose or effect. It is plainly not a mere protectionist measure and, therefore, does not constitute a *per se* violation of the Commerce Clause. *Philadelphia v. New Jersey, supra,* 437 *U.S.* at 623, 98 *S.Ct.* at 2535, 57 *L.Ed.*2d at 481.

It remains to determine whether the state interest in enforcing the injunction outweighs the burden on interstate commerce under the *Pike* test. *Pike v. Bruce Church, Inc., supra,* 397 *U.S.* at 142, 90 *S.Ct.* at 847, 25 *L.Ed.*2d at 178. That test, like the *per se* test, begins with a consideration of the legitimacy of the local interest sought to be protected. One would be hard pressed to discover a more legitimate state interest than that of protecting the health of the citizenry, an interest that can manifest itself in the conservation of natural resources such as water, *Sporhase v. Nebraska, supra,* 458 *U.S.* at 954, 102 *S.Ct.* at 3463, 73 *L.Ed.*2d at 1265, or in the preservation of diminishing sources of waste disposal, *Minnesota v. Clover Leaf Creamery Co., supra,* 449 *U.S.* at 471, 101 *S.Ct.* at 727, 66 *L.Ed.*2d at 673.

The threshold question arises, nonetheless, whether the injunction operates evenhandedly. *Pike v. Bruce Church, Inc., supra,* 397 *U.S.* at 142, 90 *S.Ct.* at 847, 25 *L.Ed.*2d at 178. In answering that question, we look to the nature of the local

problem and the character of the state response. *See Sporhase v. Nebraska, supra,* 458 *U.S.* at 954–56, 102 *S.Ct.* at 3463–64, 73 *L.Ed.*2d at 1265–66. In *Sporhase,* for example, a Nebraska statute required a permit issued by the Department of Water Resources to transport ground water from Nebraska to another state. Under the statute, the director of the department would issue a permit if he found the withdrawal of the ground water to be "reasonable, not contrary to the conservation and use of ground water, and not otherwise detrimental to the public welfare." Even after making those findings, however, a permit would not issue unless the receiving state granted reciprocal water rights to Nebraska. *Id.* at 944, 102 *S.Ct.* at 3458, 73 *L.Ed.*2d at 1258.

The Court invalidated the reciprocity requirement because it imposed an absolute ban that was not narrowly tailored to serve the state's legitimate interest in water conservation and preservation. 458 *U.S.* at 957–58, 102 *S.Ct.* at 3464–65, 73 *L.Ed.*2d at 1266–67. It sustained as evenhanded, however, the statutory delegation of authority to the Nebraska Department of Water Resources (Department) to deny permits to out-of-state applicants. *Id.* at 955, 102 *S.Ct.* at 3463, 73 *L.Ed.*2d at 1265. Although the effect of the statute was to allow the Department to reserve water for use in Nebraska, other restrictions on intrastate use demonstrated that the genuine purpose of the statute was not to protect the state's economy, but to conserve inadequate ground water supplies. *Id.* at 954–56, 102 *S.Ct.* at 3463–64, 73 *L.Ed.*2d at 1265–66. In short, the water conservation program operated evenhandedly by distributing burdens, albeit different ones, on in-state and out-of-state users.

In addition to finding that the intrastate restrictions demonstrated the genuineness of the local purpose, the Court found that "a State that imposes severe withdrawal and use restrictions on its own citizens is not discriminating against interstate commerce when it seeks to prevent the uncontrolled transfer of water out of the State. An exemption for interstate transfers

would be inconsistent with the ideal of evenhandedness." *Id.* at 956, 102 *S.Ct.* at 3464, 73 *L.Ed.*2d at 1265. Noting that Congress had not expressed a contrary view, the Court stated it was "reluctant to condemn as unreasonable measures taken by a State to conserve and preserve for its own citizens this vital resource in times of severe shortage." *Id.,* at 956, 102 *S.Ct.* at 3464, 73 *L.Ed.*2d at 1266.

In considering the lessons of *Sporhase,* we accept the trial court's finding that the tri-county municipalities need access to Kinsley to avert a health crisis. Kinsley is the only feasible place in which the tri-county municipalities can dispose of their solid waste. Given that need and the decreasing number of landfills, Kinsley may properly be characterized as a vital resource in a time of severe shortage. *See id.* at 956, 102 *S.Ct.* at 3464, 73 *L.Ed.*2d at 1266. It was that need that led the trial court to foreclose municipalities outside the tri-county area, whether within or outside New Jersey, from continuing to dump at Kinsley. As the trial court found, garbage would accumulate in the streets of Salem, Gloucester, and Camden counties if those municipalities could not use the additional sixteen-foot lift. Moreover, as previously indicated, the injunction imposes substantial obligations on the tri-county municipalities and on Salem, Gloucester, and Camden counties. Thus, like the water conservation scheme in *Sporhase,* the injunction effects an evenhanded distribution of its burdens.

We also find instructive four factors considered by the United States Supreme Court in sustaining the conservation measures in *Sporhase v. Nebraska, supra,* 458 *U.S.* at 956–57, 102 *S.Ct.* at 3464–65, 73 *L.Ed.*2d at 1266. The first consideration is whether the restriction represents an exercise in economic protectionism or of the police power. As previously set forth, we find the injunction to be a measured response to a genuine local health problem.

The second consideration is the existence of a legal expectation that the use of a landfill such as Kinsley might be restrict-

ed. Here, state and local legislators have created the legal expectation that state and local governments will manage the disposal of solid waste. *See Central Iowa Refuse Systems, Inc. v. Des Moines Metro. Solid Waste,* 715 *F.*2d 419 (8th Cir.1983) (restraint in waste flows essential to development of comprehensive waste flow plan); *compare N.J.S.A.* 13:1E–2 (each county designated as a solid waste district, and DEP is to regulate and supervise the disposal of solid waste) *with* 42 *U.S.C.A.* §§ 6901–87 (federal legislation contemplates state imposed controls on waste flow). To manage solid waste, a state must have the power to regulate and even to close landfills. The denial of continuing recourse to a landfill that has reached the limits imposed by its DEP permit should be well within the reasonable expectations of former users such as Philadelphia.

The third factor in *Sporhase* emanated from Nebraska's claim of ownership to the ground water. Justice Stevens acknowledged that the State's claim to public ownership, although not absolute, could "support a limited preference for its own citizens in the utilization of the resource." 458 *U.S.* at 956, 102 *S.Ct.* at 3464, 73 *L.Ed.*2d at 1266. Here, Kinsley is not publicly owned, but it is a public utility, *N.J.S.A.* 48:2–13; *N.J.S.A.* 48:13A–1 to –12, and must operate in the public interest, *N.J.S.A.* 48:13A–1. Hence, New Jersey's interest in the use of the landfill is akin to Nebraska's interest in the use of its ground water.

The final consideration suggested by *Sporhase* is the extent of the state's efforts to conserve the resource. At Kinsley, the availability of the additional lift is not the result of happenstance, but of New Jersey's conservation efforts. In recent years, no problem in New Jersey has attracted more governmental attention than has solid waste management. Since 1974, this Court has urged other branches of government to address solid waste as a state-wide problem. *Southern Ocean Landfill v. Mayor of Ocean Township,* 64 *N.J.* 190, 193. Through the Solid Waste Management Act, *N.J.S.A.* 13:1E–1 to –38, the Legislature has created a statutory framework that

enables state and local governments to solve the crisis. Inter-district agreements comprise a key component of solid waste management. Significantly, the trial court found that the solid waste generated by Camden and Salem counties, which executed such agreements, remained constant. In contrast, Philadelphia, which did not sign an interdistrict agreement, tripled the amount of garbage it dumped at Kinsley from 1981 to 1984. Thus, state supervision and county cooperation imbued Kinsley, although privately owned, with "some indicia of a good publicly produced and owned in which a State may favor its own citizens in times of shortage." *Sporhase v. Nebraska, supra,* 458 *U.S.* at 957, 102 *S.Ct.* at 3464, 73 *L.Ed.*2d at 1266. We conclude that the injunction may fairly be viewed as a reasonable measure taken to resurrect Kinsley for former users that have no other place to dump their garbage.

In reaching that conclusion, we remain cognizant that only in limited circumstances may a state accord preferential treatment to its own citizens. We are aware also that the loss of access to Kinsley will impose added costs on Philadelphia. Were it not for the injunction, however, the landfill would be closed not only to former customers outside the tri-county area, such as Philadelphia, but also to those within the three counties. So considered, the effect of the injunction on interstate commerce is incidental. *Philadelphia v. New Jersey, supra,* 437 *U.S.* at 624, 98 *S.Ct.* at 2535, 57 *L.Ed.*2d at 482; *Pike v. Bruce Church, Inc., supra,* 397 *U.S.* at 142, 90 *S.Ct.* at 847, 25 *L.Ed.*2d at 178.

Even if the effect could be characterized as more than incidental, the burden falling on Philadelphia would not be "clearly excessive." *Pike v. Bruce Church, Inc., supra,* 397 *U.S.* at 142, 90 *S.Ct.* at 847, 25 *L.Ed.*2d at 178. Philadelphia's lost access to an exhausted landfill must be contrasted with the disastrous results that its continued use would visit on the tri-county municipalities. With respect to the economic impact of the closure, the Appellate Division observed that Philadelphia, a city of approximately 1.7 million people with a solid waste disposal budget of approximately $4,000,000, would suf-

fer much less than the 59 municipalities in the tri-county area. 199 *N.J.Super.* at 100. The estimated increase in Philadelphia's budget for solid waste disposal is 5% for the first year following Kinsley's closure and 2% thereafter. *Id.* By contrast, the solid waste disposal budget of Glassboro, a municipality of some 14,500 people, "could escalate from $100,000 to $1,000,000 per year * * *," and the cost to Camden County, with a population of approximately 500,000 people, could increase from $3,000,000 to $12,000,000 annually. *Id.*

The closure of Kinsley, however, involves more than cost considerations. It would force the tri-county municipalities to embark on a crash garbage disposal program, one that would include, for example, siting and establishing transfer stations to store garbage temporarily, pending delivery to a permanent site. Such a program, as formidable and costly as it would be, would become obsolete in one year, when the new dump sites become operative. Furthermore, as the Appellate Division stated, "[s]ome towns, such as Clayton, Elmer, and Woodstown had no alternative to their present private-hauler service if Kinsley were closed without access to an alternate local source. The private haulers would simply close down." *Id.* Thus, practical considerations demonstrate that the task confronting the tri-county municipalities would be not merely difficult, but virtually impossible to perform. Such considerations confirm that the burden on Philadelphia is not excessive.

The final inquiry in evaluating a state conservation program under *Pike* is whether the local interest can be achieved as well with a lesser impact on interstate commerce. *Pike v. Bruce Church, Inc., supra,* 397 *U.S.* at 142, 90 *S.Ct.* at 847, 25 *L.Ed.* 2d at 178. Put differently, the question is whether a less discriminatory injunction might adequately protect the health of the citizens of southern New Jersey. *See Hughes v. Oklahoma, supra,* 441 *U.S.* at 336, 99 *S.Ct.* at 1736, 60 *L.Ed.*2d at 262.

In this regard, Philadelphia argues that all former users should be allowed continued access at proportionately reduced

levels. At first glance, that argument appears to be fair. On closer examination, however, it becomes apparent that what is superficially fair is, in reality, a request for a preference. As stated previously, were it not for the emergent need of the three counties, Kinsley would be closed to all users. Use of Kinsley has been restricted for a limited time to avert a public health crisis in southern New Jersey. Moreover, Philadelphia has alternative sites to dispose of its garbage, albeit ones that impose increased costs on the City. In contrast, the tri-county municipalities do not have access to alternative sites, to trucks or, to what may be of greater importance, to transfer stations.

The threat to local health, which the trial court described as raising a "horrendous specter," could not be averted by a less-restrictive injunction. *See Sporhase v. Nebraska, supra,* 458 *U.S.* at 957, 102 *S.Ct.* at 3464, 73 *L.Ed.*2d at 1267; *Hughes v. Oklahoma, supra,* 441 *U.S.* at 336, 99 *S.Ct.* at 1736, 60 *L.Ed.* 2d at 261–62; *Hunt v. Washington Apple Advertising Comm'n, supra,* 432 *U.S.* at 353, 97 *S.Ct.* at 2446, 53 *L.Ed.*2d at 400. Based on the record before us, a plan that accorded to Philadelphia access, even if proportionately reduced, would foreshorten the life of the landfill. Such a plan would not merely be a less effective means of obtaining time for the development of alternative sites; it would be ineffective. *See Minnesota v. Clover Leaf Creamery Co., supra,* 449 *U.S.* at 464, 473–74, 101 *S.Ct.* at 724, 728–29, 66 *L.Ed.*2d at 669, 675. So viewed, Philadelphia's demand that the tri-county municipalities incur substantial costs for a short-term solution is not so much a request for a less discriminatory alternative as it is an attempt to place an excessive burden on those municipalities. The ideal is evenhandedness. *Sporhase v. Nebraska, supra,* 458 *U.S.* at 956, 102 *S.Ct.* at 3464, 73 *L.Ed.*2d at 1265. That the injunction operates evenhandedly is apparent from the burden it places on the three counties to develop permanent alternatives.

Finally, Philadelphia contends that the trial court should have granted its motion filed on November 15, 1984, two

days after the issuance of the injunction, in which the City sought approval of a second lift, one that would extend the height of the landfill by an additional sixteen feet. At a hearing on October 23, 1984, however, a DEP expert expressed substantial reservations about the environmental acceptability of a second lift. The trial court found the testimony of DEP's expert to be more persuasive than the testimony of Philadelphia's subsequently produced witnesses. That finding is supported by substantial credible evidence in the record, and we adopt it. *Rova Farms Resort v. Investors Ins. Co., supra,* 65 *N.J.* at 483–84. Before us, Philadelphia has moved to supplement the record with the deposition testimony of the Environmental Program Administrator of the Gloucester Planning Department and with affidavits from other persons. The deposition of the administrator is incomplete—as of the date of oral argument, he had not been cross-examined—and we must decide the present matter on the record as established before the trial court. Consequently, we deny Philadelphia's motion to expand the record.

The judgment of the Appellate Division is affirmed.

*For affirmance* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal* —None.