TOWNSHIP COMMITTEE OF THE TOWNSHIP OF SOUTH HARRI-SON; MARY ANN ALLS; HERBERT DANNER; WARREN MORGAN; THOMAS SORBELLO; AND RUSSELL MARINO, PLAINTIFFS, v. BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF GLOUCESTER AND NEW JERSEY DEPART-MENT OF ENVIRONMENTAL PROTECTION, DEFENDANTS.

KINSLEY'S LANDFILL, INC., PLAINTIFF, v. GLOUCESTER COUN-TY BOARD OF CHOSEN FREEHOLDERS; NEW JERSEY DE-PARTMENT OF ENVIRONMENTAL PROTECTION; AND ROB-ERT S. HUGHEY, COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, DE-FENDANTS.

Superior Court of New Jersey
Law Division Gloucester County

Decided August 15, 1985.

*Lewis Goldshore,* Lawrenceville, for plaintiffs (*Goldshore* and *Wolf,* attorneys).

*Robert Rochford,* Roseland, for plaintiff Kinsley's Landfill, Inc. (*Carella, Byrne, Bain & Gilfillian,* attorneys).

*Bruce Hasbrouck,* Woodbury, for defendant Board of Chosen Freeholders of Gloucester Cty. (*Hasbrouck & Uliase,* attorneys).

*Harley A. Williams, Jr.,* Dep. Atty. Gen. (*Irwin I. Kimmelman,* Atty. Gen. of N.J.), for Defendant D.E.P.

MILLER, EDWARD S., J.S.C.

This prerogative writ action challenges the actions of the Board of Chosen Freeholders of Gloucester County in selecting a certain area in the Township of South Harrison in Gloucester County as the site for a county sanitary landfill. The suit not only challenges the environmental wisdom of the selection but further raises issues as to the legitimacy of the actions taken by the Board of Freeholders. Prior to a discussion of this case, certain observations are in order:

If, over three centuries ago, John Donne pointed out that "no man is an island entire of itself," the truth of this saying is demonstrated by the setting of the instant controversy. This case forms but one facet of a crisis in waste disposal which envelopes not only the County of Gloucester but the entire State of New Jersey and probably the country as a whole. The case simply cannot be viewed as a separate specimen, but must be regarded in the light of the surrounding circumstances. As Justice Pollock stated in *Glassboro v. Gloucester County Board of Freeholders*, 100 *N.J.* 134 (1985), "Understanding the legal significance of the preceding facts begins with the recognition that New Jersey is in the throes of a solid waste crisis." *Id.* at 53.

While a separate case, and tried by a separate judge, the instant case is inexorably intertwined with the *Glassboro* case. *Glassboro* ordained the closure of the Kinsley Landfill; *South Harrison*, the instant case, deals with the course of subsequent events leading up to and following the closure of Kinsley. Regardless of which case one considers, the simple fact remains, as the trial court, the Appellate Division and the Supreme Court found in *Glassboro*, there is in existence a state of urgency, impelling to the point of being critical, as to the disposition of solid waste in the State of New Jersey. While meetings debate, counsel argue and courts consider, the inescapable truth is that every day there is deposited within the confines of the State of New Jersey thousands of cubic yards of

solid waste and, like the fate of the sorceror's apprentice, the influx never stops. Every court which has approached the Gloucester County situation has emphasized that there is a public health emergency pending. This Court concurs.

On this same issue, Judge Stanley Brotman has further pointed out:

> The court takes judicial notice of the political turmoil that often besets communities when local land use boards begin choosing the location for a new landfill. Pressures abound from individuals and municipalities who acknowledge the need for such facilities but urge that they be built somewhere other than their own neighborhood. As in the case at bar, planners are placed in a classic "damned if they do, damned if they don't" situation, where *any* location they choose would engender protests and litigation. [*Fenning v. Materio*, Civ. No. 83–3986 (D.N.J.1984), slip opinion at 21, n. 5. (emphasis in original).]

Prior to and during the trial of this case, plaintiffs made repeated efforts to supplement the record. The thrust of the arguments advanced was that the actions of the freeholders attacked in this prerogative writ proceeding were improper because of factors *dehors* the record. Examples of these contentions are the argument that the freeholders had prejudged the matter prior to the meeting and hence, their decision was tainted; the argument that the Open Public Meetings Act was not complied with, etc. The Court repeatedly admonished counsel that this was a prerogative writ proceeding, that it would be only tried upon the record below except insofar as the Court, in its discretion, would permit evidence in support of the theories hereinabove set forth. The Court, at the pretrial conference and in subsequent proceedings, divided the issues into two categories: (a) "governmental issues", the arguments that the proceedings were tainted because of matters outside the record and (b) "environmental issues", these being the issues pertaining to the merits of the site from an environmental and sanitary waste perspective; in short, those which were to be passed upon by the Department of Environmental Protection pursuant to the Solid Waste Management Act, *R.S.* 13:1E–23 *et seq.*

The Court has previously discussed in an opinion filed in this case the "double track" procedure provided by the statute in that the Solid Waste Management Plan must be approved by the Department of Environmental Protection, pursuant to *R.S.* 13:1E–24, and the prerogative writ procedures specifically provided for in 13:1E–23(f). As the Court pointed out, the only way this procedure makes sense is to recognize the dichotomy between a review of the environmental features and the ability to challenge irregularities in the procedure by way of prerogative writs. This Court has neither the expertise nor the resources to intelligently review the environmental aspects of the Solid Waste Management Plan; hence, deferred to the Commissioner and granted partial summary judgment striking those aspects from consideration by this Court. On the other hand, it is equally obvious that the Commissioner has neither the expertise nor the legal power to properly adjudicate the governmental issues such as those raised in this case.

(Notwithstanding the actions of the Court in refusing to consider the environmental aspects of the case, the Court has nevertheless read and studied the record below and states unequivocally that had it passed upon the "environmental aspects", its decision would have been the same as that of the Board of Freeholders. In so finding, it would appear this is a necessary concomitant to a finding that the Board of Freeholders acted within the boundaries of its discretion and did not abuse the same.)

It becomes very easy in a case of this type and magnitude to lose sight of the essentially simple nature of the issues to be decided. What this Court is asked to determine is whether or not the Board of Chosen Freeholders abused its discretion by its adoption on December 27, 1984 of a resolution authorizing an amendment to the Gloucester County Solid Waste Management Plan. The sole purport of this amendment is to include the designation of the subject site as the proposed site for the landfill mandated by the courts.

(It is significant that the resolution in question specifically provides limitations upon its effect, thus:

> Be it further resolved that the designation of said site be provisional in that there shall be no condemnation proceedings or construction commenced until the appropriate environmental impact study, economic assessments and hydrogeological assessments are completed by an engineering firm(s) other than Speitel Associates ... No site construction shall commence until such time as the Board shall direct.

It can thus be seen that no irrevocable step has been taken by the Board. It is conceivable that the environmental impact statement referred to might well negate further consideration of this site; test borings are to be analyzed and other preliminary work performed prior to the finalization of this site.)

Within this framework, the Court tried this case for seven trial days. Based upon the issues framed, the facts follow.

Plaintiff, Kinsley's Landfill, Inc. (Kinsley) is a corporation of the State of New Jersey, having an office at Route 41, Deptford Township, Gloucester County, New Jersey. Kinsley operates a sanitary landfill at the intersection of Routes 41 and 47 in Deptford Township, New Jersey (Kinsley's Landfill). It has also been a major disposal site for solid waste from the City of Philadelphia.

Plaintiff, the Township Committee of the Township of South Harrison (Township) is the governing body of the Township of South Harrison. Certain other interested citizens, taxpayers and owners of some of the affected lands have also joined in as plaintiffs.

South Harrison Township has a population of approximately 1500 residents. There are 908 registered voters in the Township. (Gloucester County has 11,970 registered voters).

On June 11, 1979, the Gloucester County Board of Chosen Freeholders adopted the Gloucester County Solid Waste Management Plan (Plan). The Plan was submitted to the New Jersey Department of Environmental Protection (DEP) for review and approval.

On November 13, 1979, the DEP issued a Certification of Modification of the Plan detailing deficiencies and recommending certain necessary modifications.

On August 4, 1980, the Board adopted modifications to the Plan in response to the DEP Certification of Modification.

On September 26, 1980, the DEP issued a Certification of Approval with Modification of the Plan, which again specified remaining deficiencies and necessary modifications.

On February 9, 1983, the Board adopted the Gloucester County Solid Waste Management Plan Update (Update). The Update consisted of a Policy-Objective "Ten-Year Plan" and a detailed "Two-Year Program." This Update was intended to provide a review of the solid waste disposal alternatives available to the County. It recommended that the County meet its solid waste disposal needs for the next ten years by: continuing landfilling at Kinsley's Landfill until 1988; implementing a waste-to-energy plant by 1987 and a county-owned landfill by 1988; proceeding with interdistrict waste flow agreements to meter out-of-county wastes and implementing county-wide recycling.

Pursuant to the Update, the policy of utilizing Kinsley's Landfill as the authorized county landfill until 1988 was subject to certain conditions. These conditions included, *inter alia,* that Kinsley's Landfill operate within the permitted design capacity with no expansion, and subject to the DEP's permit of May 19, 1980 as revised on September 24, 1980.

On July 28, 1983, the DEP issued a Certification of Approval of the February 9, 1983 Update with deficiencies noted. One of the deficiencies was the failure to designate any suitable additional sites for disposal of the County's solid waste for the remainder of the ten-year period after 1986–1987.

On January 3, 1984, the DEP and the Board of Public Utilities (BPU) promulgated waste flow orders, *N.J.A.C.* 7:26–6.1 *et seq.* These waste flow orders designated specific facilities state-wide to serve the solid waste disposal needs of specif-

ic geographic areas in the State. Pursuant to these waste flow orders, Kinsley's Landfill was designated as the landfill for the majority of Gloucester County and for a number of Salem County and Camden County municipalities.

On June 20, 1984, Kinsley filed an application with the Board for a vertical and horizontal expansion of Kinsley's Landfill, due to the fact that the landfill was reaching its permitted capacity.

The Gloucester County Solid Waste Advisory Council (SWAC) is a public body which was created by the Board pursuant to the Solid Waste Management Act, (SWMA). *R.S.* 13:1E–1 *et seq.*

On July 25, 1984, SWAC voted (6–4–1) to recommend to the Board that the County Plan be amended to provide for the requested expansion of Kinsley's Landfill.

On August 2, 1984, the Board of Freeholders was notified by Robert E. Hughey, Commissioner of the DEP, that the County had not fulfilled its obligations, under the SWMA, to provide adequate waste disposal sites or alternate means of disposing of its solid waste.

On August 23, 1984 and September 13, 1984, the Board conducted two public hearings on the proposed expansion of Kinsley's Landfill and on September 24, 1984, at a special meeting of the Board, it voted (7–0) to deny the application for expansion.

The Board resolution of September 24, 1984 denying the expansion of Kinsley's Landfill required the immediate implementation of the portion of the Plan relating to the development of a county-owned landfill.

On October 17, 1984, the Borough of Glassboro, Gloucester County, New Jersey filed a verified complaint in lieu of prerogative writ in the Superior Court of New Jersey, Law Division, Gloucester County *Bor. of Glassboro v. Gloucester Cty. Bd. of*

*Chosen Freeholders* Docket No. L–070476–84 P.W., seeking, *inter alia,* injunctive relief to keep Kinsley's Landfill open.

On November 13, 1984, the Honorable Samuel G. DeSimone, A.J.S.C., entered an order for preliminary injunction in that case. The salient points of this order are:

1) That defendants were restrained from taking any action which would prevent the continued uninterrupted use of Kinsley's Landfill in accordance with the terms of this order;

2) The Counties of Camden, Gloucester and Salem were ordered to proceed immediately with implementation of one or more landfills within their borders, with such landfills to become operational within 12 months of the date hereof in accordance with Exhibits B and C attached hereto with respect to Camden and Gloucester Counties, and with respect to Salem County, in accordance with a schedule to be filed with the Court;

3) Not later than November 27, 1984 at 4:00 P.M. Kinsley's Landfill should cease accepting all solid waste generated within the City of Philadelphia and other Pennsylvania communities and shall cease accepting other out of district solid waste not subject to interdistrict agreements;

4) Not later than November 27, 1984, all municipalities within the borders of Camden, Gloucester and Salem using the Kinsley's Landfill should maximize their recycling efforts, including curbside pickup, mandatory ordinances, stepped up public awareness campaigns, and increased enforcement efforts and shall report to the Court and the DEP within such time;

5) Except as provided in paragraph number 3 above, all wastes presently disposed of at the Kinsley's Landfill would be disposed of at the vertical expansion to the Kinsley's Landfill until it reached capacity, at which time said wastes were to be redirected to the new landfills to be implemented in the Counties of Camden, Gloucester and Salem;

6) Disposal of sewage sludge at Kinsley's Landfill must cease on March 15, 1985;

7) Kinsley's Landfill might implement a vertical expansion for one additional life of compacted solid waste to be conducted in accordance with the engineering design submitted by Kinsley and in accordance with the report submitted to the Court by DEP;

8) The Counties of Salem, Gloucester and Camden must report to the Court not later than December 24, 1984 on the status of site selection for county landfills;

9) The Township of Deptford must issue the building permits necessary for the vertical expansion of Kinsley's Landfill;

10) Any provision of this Order could be modified or dissolved by application of any party on one-day notice to all other parties;

11) The Court retained jurisdiction; and

12) The motion of the City of Philadelphia to stay this order pending appeal is denied.

On December 19, 1984, the County and the DEP entered into an Administrative Consent Order. This Administrative Consent Order contains a timetable to implement the order for preliminary injunction entered in the *Glassboro* case. Pursuant to this Consent Order, the County was required to adopt and submit amendments to the DEP to its Plan designating a site for the county landfill facility by January 1, 1985. The DEP review of the amendments was to be completed by February 1, 1985.

On November 21, 1984, the County entered into a contract with Gerald E. Speitel Associates, Consulting Environmental Engineers (Speitel). Under this contract, Speitel agreed to provide professional engineering services necessary to bring about the completion of a county owned landfill. The contract authorized Speitel to undertake the first phase of the landfill project, the siting of the county landfill. Any further work to be done by Speitel was required under the contract to be authorized by the County.

On December 12, 1984, Speitel submitted to the Board a document entitled "Gloucester County Landfill Site Selection." The report recommended a site in South Harrison Township, Gloucester County, New Jersey for the county landfill (South Harrison site). This site is the one which forms the basis of this suit.

The South Harrison site consists of approximately 420 acres situated on the westerly side of Swedesboro-Monroeville Road northwest of Route 45. The northwesterly boundary of the site is the South Harrison-Woolrich Municipal Line. The site is designated on the tax map of South Harrison Township as Block 9, Lots 2, 3, 10, 11, 12, 13, 17, 18, 19 and an unnumbered lot near 18 and 19 and parts of Lots 4, 5 and 9.

The South Harrison site is largely wooded and contains part of a peach orchard, cultivated farm fields, some old fields and five houses. The Court inspected this site and recognizes its natural advantages and that it is, to a significant degree, intelligently and profitably farmed. The area surrounding the

proposed site is an active farming community, with fruit orchards and cultivated fields.

The Court has examined the Speitel report which was stipulated into evidence as Exhibit E–15. It is noted that the report frankly indicated that it was made on an "expedited schedule," in compliance with the orders of Judge DeSimone in the *Glassboro* case. Nevertheless, the report, in its initial stages sets forth criteria to be employed in the selection of a site.

In selecting the site, Speitel utilized two levels of criteria which were developed and discussed with the County Planning Department staff and with a committee of SWAC.

The initial criteria were as follows: substantially vacant land about 200–300 acres in size; not in the Pinelands; not on the Cohansey or Potomac-Raritan-Magothy formations outcrop; not in Wetlands; not containing significant flood plains; not in recreation areas or parks; not within 5000 feet of a commercial airport.

The second level of criteria used by Speitel related to evaluating the site. These criteria were as follows: surface hydrology; population density around the site; groundwater conditions; geology and soil conditions; topographic relief; presence of endangered species or historica; archeological or cultural resources; surrounding land use and area and capacity.

Significantly, the report states "visual inspections were made of potential site *areas*. During this inspection, a team of engineers, planners, an environmental scientist and a geologist reviewed the site areas and then assembled relevant information about them". *Speitel Report,* at 8.

It is significant that this portion of the report was not factually challenged by plaintiffs. From it, it is clearly stated that what the evaluating team did was to select the South Harrison site as its choice over other areas.

From the presentation made by Speitel at the public hearing held on December 27, 1984 and other evidence, it is clear that

the recommendation of the South Harrison site was based on a review of an earlier site selection report prepared by Kupper Associates, Inc. and other data from county and state agencies. Speitel narrowed the possible sites for the county landfill to five. The five sites were reviewed further and one site was dropped from consideration as unsuitable. From the four remaining possible sites, Speitel selected the South Harrison site as the one to recommend to the Board of Freeholders. These facts would appear to dispose of plaintiffs' contention that only this site was considered.

SWAC conducted a special meeting on December 12, 1984 to consider the Speitel report. The meeting commenced at approximately 6:00 p.m. and was adjourned at approximately 7:15 p.m. During the meeting, SWAC voted (9–1–4) to adopt the recommendation to site a county-wide landfill in South Harrison Township.

South Harrison Township was informed of the SWAC meeting at approximately 12:00 a.m. on December 12, 1984. South Harrison charges that the actions of the SWAC at the meeting on December 12, 1984, (the perfunctory nature of the SWAC consideration and approval of the Speitel report and SWAC's refusal to postpone its action on the report) have efficiently denied plaintiffs and other parties a right to meaningfully participate in the solid waste management planning process in violation of *R.S.* 13:1E–2.b(3). In this respect, the cited section of the statute reads:

(3) provide citizens and municipalities with opportunities to contribute to the development and implementation of solid waste management plans by requiring public hearings prior to their adoption *and* by creation of solid waste councils.

It is to be noted that this statute is in the disjunctive and not the conjunctive and does not require a public hearing prior to the action of a solid waste council.

■ In any event, the Court finds that the Township and individual plaintiffs, in fact, have had an opportunity to participate meaningfully (if such be the legal requirement) by their

appearance before the SWAC and by their vigorous, active, planned and meaningful participation in the public hearing of December 27, 1984.

■ In an effort to challenge the regularity of the proceedings, plaintiffs produced the testimony of John Gyer, a member of SWAC. Gyer complained of the short notice and attempted to convey the impression that an incomplete record was delivered to him at a meeting of SWAC on December 12, 1984. On cross-examination, however, he equivocated. The Court has examined the resolution and notes that of the fourteen members voting, nine voted in favor, one against, and there were four absentions; one of which was Gyer. Nothing in Gyer's testimony is sufficient to overcome the presumption of regularity to be afforded the action of SWAC and the Court finds the same regular, noting, however, in passing, that the resolution and actions of SWAC were merely advisory.

The Board of Chosen Freeholders on Friday, December 14, 1984 and again on Sunday, December 16, 1984, caused notice of a public hearing to be held by the Board on December 27, 1984. (The Court finds Kinsley's attempt to challenge these two publication dates to be totally specious. Proof of publication in the form of a sworn affidavit was admitted into evidence as a *Joint Exhibit* (E–19). The Court finds as a fact that notice was published on those dates.) The purpose of the public hearing was to consider an amendment to the County Solid Waste Management Plan designating the South Harrison site for the county landfill.

Plaintiffs contend that the notice given by the Board did not comply with the notice requirements of the Solid Waste Management Act, *R.S.* 13:1E–1 *et seq.* Specifically, plaintiffs argue that the Board violated the notice provision of *R.S.* 13:1E–23(d).

This provision provides that notice of a public hearing shall be:

published in a newspaper of a general circulation in the solid waste management district once each week for 2 consecutive weeks, and the last publication shall not be less than 10 days prior to the date set for the hearing. *R.S.* 13:1E–23(d).

While plaintiffs admit that the notice was published for two consecutive weeks and not less than ten days prior to the date scheduled for the hearing, they argue that the notice did not provide them with the two weeks of notice that is contemplated by *R.S.* 13:1E–23(d).

■ The Court does not agree that the statute requires that two weeks' notice be given. Rather, the language clearly states that notice of a public hearing shall be published once each week for two consecutive weeks. As the County argues, if the Legislature wanted to require two weeks' notice, the statute would have been so drafted. *Cf. R.S.* 40:55–25 (repealed).

Moreover, even if the Court assumed that two weeks' notice was required and the Board failed to strictly follow these requirements, the Court finds that any such violation did not deprive plaintiffs of due process. The basic requirements of due process are notice and an opportunity to be heard. *See Fuentes v. Shevin,* 407 *U.S.* 67, 80, 92 *S.Ct.* 1983, 32 *L.Ed.*2d 556 (1972); *New Jersey Zinc Co. v. Board of Review,* 25 *N.J.* 235, 239 (1957); *In re Musiello,* 25 *N.J.* 590, 600 (1958).

In this instance, in addition to the published notices of December 14 and 16, 1984, the Board also published notices of the public hearing on December 19, 24 and 26, 1984. The Court finds that plaintiffs were afforded ample notice of the public hearing.

The Board conducted the public hearing on December 27, 1984 as scheduled. A request by plaintiffs at a meeting of the Board on December 19, 1984 to postpone the hearing for 60 days was denied.

The public hearing convened at approximately 6:30 p.m. on December 27, 1984 and continued until approximately 6:30 a.m.

on the morning of December 28, 1984. At 6:30 a.m. on December 28, 1984, the Board adjourned the public hearing and closed the public portion thereof. The public hearing was adjourned until 6:30 p.m. on December 28, 1984. The Board informed those present at the public hearing that it would reconvene that evening at 6:30 p.m. Notice of the adjournment was also given to KYW radio which broadcast the information, and continued to broadcast it throughout the day of December 28, 1984.

Over 800 people attended the public hearing of December 27, 1984. When the Board reconvened in the evening of December 28, 1984, over 350 people were in attendance.

The Court has been supplied with the stenographic transcript of the hearing of December 27, 1984. It is voluminous, occupying 504 consecutive pages of testimony. Over 60 persons testified and numerous exhibits, documents, petitions, reports, etc. were presented. Even a cursory examination of the transcript reveals that despite protestations concerning the short period of time in which plaintiffs had to prepare, the Township put together a detailed and comprehensive case.

The Court has studied this transcript thoroughly and with a great deal of interest. From its examination of the transcript, the Court makes the following observations:

1. While the numerical majority of witnesses were in opposition to the proposed site, once what can be termed as the formal presentation by the Township was completed, the bulk of the remaining witnesses testified either as to potential problems with landfills in general or as to the agricultural nature of the area surrounding the proposed site.

2. As previously discussed, consideration was given to other sites. Thus, William Fleming stated that areas were studied in East Greenwich, Mantua, Harrison, South Harrison, Woolrich, Elk and Logan Townships. He testified that from the evaluation of those sites, two areas containing four sites were identified and further evaluated.

3.  The possibility of locating a landfill on land owned by Kinsley, not forming part of the present landfill, was presented to the Board by persons making presentations. Specifically, John Wopat, one of the attorneys for Kinsley, addressed the Board urging that the present Kinsley facility "offers significant advantage to Gloucester County."

4.  In the interim between the preparation of the Speitel Report and the public hearing, Speitel conducted further evaluations of the site including on-site inspections and test borings. This additional information was presented to the Board at the public hearing.

5.  In addition to representatives from Speitel present at the public hearing was a representative from the DEP and the County's environmental specialist. All of these individuals during the course of the public hearing addressed specific questions from both the public and the Board.

The Court makes mention of these facts and references other facts in the record not spelled out here to address a number of issues raised by plaintiffs.

Kinsley argues that the public hearing was a "sham", in that the transcript of the proceedings reveals no attempt to consider or address the objections raised by various speakers. As a result, Kinsley contends that the public was denied a meaningful opportunity to participate in the decision-making process as required by the SWMA.

█    From the Court's observations outlined above, particularly the last one, it is clear that this argument is without merit. Moreover, just from the length of the hearing and the number of speakers it is evident that the public's participation was in no way hindered by any actions of the Board.

Both the Township and Kinsley attack the Board's refusal to consider a further extension of Kinsley's Landfill or siting a county landfill in other lands owned by Kinsley adjacent to the present landfill. The Township argues that the Board's actions

with respect to Kinsley are inconsistent with the SWMA and are otherwise arbitrary, capricious and unreasonable. Kinsley argues that it has been denied substantive and procedural due process by the actions of the Board.

To adopt these arguments is to close one's eyes to the realities of the instant situation. Kinsley's Landfill is under an order from Judge DeSimone (now affirmed by the Supreme Court) in the *Glassboro* case to close by a given date. The Board has previously decided not to approve the expansion of Kinsley's Landfill. The merits of that decision are before Judge DeSimone. This Court is solely concerned with the actions of the Board as they relate to the South Harrison site.

■ All of these arguments fail to consider the simple fact as was stated by Judge Haines in *Tp. of Florence v. Bd. of Chosen Freeholders of Burlington Cty.* (Docket No. L–70135–81, L–69464–81, L–70141–81) *aff'd* by App.Div. (Docket No. A–4167–82T1, A–4256–82T1, A–4295–82T1, A–4298–82T1) *petition for certif. denied,* October 22, 1984, 99 *N.J.* 172 and by this Court in *Township of Deerfield v. Cumberland County Board of Chosen Freeholders,* Docket No. L–18001–84E P.W., *aff'd* by App.Div. Docket No. A–2061–84T5, that the Board is not required in a situation of this type to examine *every* potential site. The issue is not whether the Board selected the best site available, because if that were the criteria, the minds of men would never meet. The issue is whether or not the Board's decision in selecting a particular site which meets the criteria laid down by professionals for a landfill is rational. If it was, the fact that there were better sites available is immaterial. It is for this reason that the Court excluded testimony proffered by both South Harrison and Kinsley to the effect that there were available better sites.

■ For the same reason, the Court excluded proffered testimony which attempted to retry the evidence heard by the Board on December 27, 1984. For example, an expert witness was proffered with respect to the underground aquifers involved in

the site in question. Upon objection duly made, the Court excluded this testimony and other testimony along similar lines dealing with other technical environmental issues. The record discloses that these matters were brought to the Board's attention during the public hearing, and the fact that additional testimony might be available to "second guess" the decision of the Board is not a justification for receiving it. Sight must never be lost of the fact that the issue is not whether the site is a good site or bad site in the mind of the Court, but whether there was testimony in the record when the Board passed the resolution in question which would justify a finding that its actions were not arbitrary and capricious. The Court finds that there was ample testimony on both sides; that the Board had an opportunity to weigh and evaluate the witnesses even better than this Court and that it did not abuse its discretion by the decision that it made.

When the public hearing reconvened at 6:30 p.m. on December 28, 1984, the Board voted (6–1) in favor of adopting Resolution 84–12–54, "Resolution Authorizing the Adoption and Filing of an Amendment to the Gloucester County Solid Waste Management Plan with the N.J. D.E.P. and Board of Public Utilities." Resolution 84–12–54 amends the County Plan to designate the South Harrison site as the location of the county landfill. It is this resolution which is attacked in this suit. (As an aside, the Court notes that on February 1, 1985, DEP Commissioner Robert E. Hughey issued a Certification of Approval of the Amendment to the Plan designating the South Harrison site. Plaintiffs have appealed that decision and the appeal is currently docketed in the Appellate Division of the Superior Court of New Jersey).

It developed during trial that there was no transcript made of the proceedings on the evening of December 28, 1984. The Court, however, was supplied with a copy of the minutes of the entire two-session meeting.

■ The Court finds that the failure to provide a transcript of the evening session of the 28th at which no additional testimony from the public was taken, while extremely regrettable, is not fatal. The minutes, prepared in full compliance with the Open Public Meetings Act, *R.S.* 10:4–14, clearly reveal that the proceedings were conducted in an orderly fashion and that each freeholder made a public statement explaining his reason for the adoption of the resolution with the exception, of course, of Freeholder Paul Oland, who voted against the resolution for reasons which he likewise stated. The minutes, coupled with the transcript from the portion of the hearing where the public participated, creates a sufficient record to review the Board's decision. Consequently, the failure to provide a transcript of the proceedings on the 28th is not fatal.

Plaintiffs allege that in selecting the South Harrison site, the Board failed to consider local land use policies and ordinances of the Township of South Harrison. Specifically, plaintiffs contend that the selection of the South Harrison site is inconsistent with the Township's Master Plan and in violation of Township Ordinance 04–82.

On March 10, 1980, the Township Planning Board adopted a Master Plan pursuant to *R.S.* 40:55D–28. According to this Master Plan, the location of the proposed county landfill is within an area zoned for residential use.

On July 14, 1984, South Harrison passed Ordinance 04–82, which is entitled "An Ordinance Regulating the Location and Operation of Landfills in the Township of South Harrison, Gloucester County, New Jersey." Section 1 of this ordinance states:

> No landfill shall be located in South Harrison Township within one-half mile of any residential dwelling, one-half mile of any productive farmland, or one mile of any school or public part.

In support of their argument that the Board is required to consider local land use policies, plaintiffs point to *R.S.* 13:1E–21(b)(3). This section of the SWMA, however, does not require the Board to consider these factors. This section only applies

to circumstances where the Board has certified the absence of appropriate sites in the solid waste district and its inability to find a site in another district. When such circumstances exist, the responsibility for siting a solid waste facility rests on the Commissioner of the DEP and it is the Commissioner who must consider these factors.

Moreover, the SWMA has preempted local zoning and planning ordinances in the area of solid waste disposal and management. *See Southern Ocean Landfil v. Mayor and Council of the Tp. of Ocean,* 64 *N.J.* 190 (1974); *Ringlieb v. Parsippany-Troy Hills Tp.,* 59 *N.J.* 348 (1971); *Chester Tp. v. Dept. of Envtl. Protection,* 181 *N.J.Super.* 445 (1981); *Little Falls Tp. v. Bardin,* 173 *N.J.Super.* 397 (App.Div.1979). Thus, to the extent that the siting of the county landfill in South Harrison Township is inconsistent with local land use policies, those policies are not binding on the county. In this context, plaintiffs' reliance on *Rollins Envtl. Servs. v. Logan Tp.,* 199 *N.J.Super.* 70 (L.Div.1984), which involved a narrowly drawn ordinance limiting the location of the hazardous substance, PCB, in certain well-defined environmentally sensitive areas in the Township is misplaced. The scope and focus of South Harrison's Master Plan and Ordinance 04-82 are much broader and factually distinguishable from the situation in *Rollins.*

The Court notes, however, that local land use policies were considered in the site selection process. The criteria utilized by Speitel in its analysis included factors such as surrounding land use, population density and groundwater conditions.

Finally, the Court has examined the Township's zoning ordinances and Ordinance 04-82 and makes the following observations. First, while it is true that the selected site is within an area zoned residential, it is significant that one of the uses specifically permitted in such an area is utility uses. Interestingly, a solid waste disposal facility (i.e. landfill) is defined by *R.S.* 48:2-13 as a public utility. *See also Little Falls v. Bardin,* 173 *N.J.Super.* 397, 415-16 (App.Div.1979). Thus, the

Township's zoning ordinances by their own terms permit certain non-residential uses in residential zones.

■ Second, although Ordinance 04–82 was passed by the Township in July 1984, it was not filed with the County Planning Board until June 11, 1985. Before a local zoning ordinance becomes in effect it must be filed with the County as provided by *R.S.* 40:55D–16. Since the ordinance was not in effect on December 27–28, 1984, when the Board passed the resolution challenged in this suit, plaintiffs' contention that the Board failed to consider this ordinance cannot be sustained.

It is further alleged by plaintiffs that the Board violated the SWMA by failing to consult with the Township of South Harrison or the Township Planning Board or certain county agencies, specifically the Tri-County Water Quality Management Policy Board, as required by *R.S.* 13:1E–20(b). This section requires that in the development and formulation of a solid waste management plan for any district the Board of Freeholders shall:

> (2)(a) Consult with the county *or* municipal government agencies concerned with, or responsible for, water pollution control, water policy, water supply, or zoning or land use within the solid waste management district; [*R.S.* 13:1E–20(b)(2)(a); emphasis supplied.]

■ The Court finds that the Board did not fail to consult with the necessary agencies within the County. First, looking at the transcript of the public hearing of December 27, 1984, it can be seen that the members of the South Harrison Township Committee testified before the Board.

Moreover, the Speitel report clearly states that the criteria utilized in selecting the South Harrison site were developed through consultation with the Gloucester County Planning Board. Significantly, the Planning Board is not only the county agency responsible for land use policies within the County, but is also responsible for water quality and quantity management issues for the County. Consequently, the Court finds no merit in plaintiffs' allegation of a violation of *R.S.* 13:1E–20(b).

Plaintiffs also challenge the actions of the Board in entering into the contract with Speitel. Specifically, plaintiffs allege that the Board failed to comply with the bidding requirements of the Local Public Contracts Law, *R.S.* 40A:11–1 *et seq.,* and the Board violated the spirit of the Act by allowing the potential for favoritism to exist in the awarding of the contract. As a result, plaintiffs argue that the contract with Speitel is null and void and the Speitel report, the product of a void contract, cannot provide a credible basis for the Board's decision.

Under the Local Public Contracts Law, professional services, as defined by *R.S.* 40A:11–2(6), are exempt from the public bidding requirements. Plaintiffs, however, contend that Speitel did not perform any professional services because the preparation of the landfill siting report involved nothing more than the compilation of pre-existing data.

Plaintiffs' argument is the equivalent of stating that all an attorney does is read cases or all a physician does is record a patient's symptoms. Such a narrow reading of the function of Speitel in this case does not comport with reality. Even a cursory examination of the report prepared by Speitel shows that the services performed were the services of trained environmental engineers fully within the purview of *R.S.* 40A:11–2(6). Thus, the Court finds that the contract with Speitel was not entered into in violation of the Local Public Contracts Law.

Plaintiffs also argue that the contract with Speitel was tainted by the potential for favoritism in its award. In support of this argument, plaintiffs point to the fact that William Fleming, the Vice-President of Speitel, is a social acquaintance of the assistant county counsel assigned to solid waste matters. Based on this fact, plaintiffs argue that the awarding of the contract to Speitel violated the underlying purpose of the Local Public Contracts Law.

The facts adduced show that the contract was awarded to Speitel based upon a proposal submitted by that firm to the County in the fall of 1984. The Court finds that the existence

of some sort of social relationship between a Speitel employee and the assistant county counsel, who is *not* a member of the Board of Freeholders, did not taint the awarding of the contract to Speitel.

Even if the Court found that the Board had somehow violated either the letter or the spirit of the Local Public Contracts Law, the relief sought by plaintiffs in this action is inappropriate. Whether the contract with Speitel is valid or not is irrelevant to this action. The validity *vel non* of the contract is an issue vis-a-vis the County and Speitel. The fact that the contract might be void does not invalidate the services already performed under the contract. If the contract is void, an issue not before this Court, the County has its remedies under basic contract principles. *See, e.g., Hudson City Contracting Co. v. Jersey City Incinerator Auth.,* 17 *N.J.* 297 (1955); *S.H. Roemer Co. v. Camden County,* 91 *N.J.Super.* 336 (Law Div.1966).

Plaintiffs raise several separate alleged violations of the Open Public Meetings Act, *R.S.* 10:4–6 *et seq.,* the so-called Sunshine Law. These alleged violations are as follows: (1) SWAC's failure to provide advance public notice of its December 12, 1984 meeting; (2) the Board's failure to comply with the notice requirements of the Open Public Meetings Act by adjourning the December 27, 1984 public hearing on the morning of December 28, 1984 and reconvening the evening of December 28; and (3) the Board's conducting a private meeting on December 10, 1984 to discuss public information. The Court will address these allegations *seriatim.*

As discussed, *supra,* SWAC conducted a meeting on December 12, 1984 to consider the Speitel report and site recommendation. The Township was notified of the SWAC meeting at approximately 12:00 a.m. on December 12, 1984. Plaintiffs argue that the notice to the Township did not comply with the definition of adequate notice ("written advance notice of at least 48 hours") set forth in the statute, *R.S.* 10:4–8(d). As a

result of this alleged violation, plaintiffs contend that the designation of the South Harrison site must be vitiated.

In presenting this argument, plaintiffs attempt to characterize SWAC as a "public body" as defined by *R.S.* 10:4–8(a). This section defines "public body" as:

a commission, authority, board ... organized under the laws of this State, and collectively empowered as a voting body to perform a public governmental function affecting the rights, duties, obligations, privileges, benefits, or other legal relations of any person, or collectively authorized to spend public funds.... [*R.S.* 10:4–8(a).]

Since SWAC does not have the authority to spend public monies, plaintiffs' argument rests on the first part of the above definition (i.e., a voting body empowered to affect the rights, etc. of any person).

The Court finds plaintiffs' attempt to characterize SWAC as a "public body" within the purview of the Open Public Meetings Act to be unpersuasive. The Legislative findings and declaration section of the statute emphatically states:

The Legislature, therefore, declares that it is the understanding and the intention of the Legislature that in order to be covered by the provisions of this act a public body must be organized to spend public funds or affect persons' rights; that, therefore, informal or *purely advisory bodies with no effective authority are not covered*.... [*R.S.* 10:4–7; emphasis supplied.]

Under the SWMA, the purpose of SWAC is to give citizens and municipalities the opportunity to take part in the formulation and implementation of solid waste management plans. *See* 13:1E–2(b)(3). The size, composition and membership of SWAC is determined by the Board of Freeholders. The decision as to when and how to consult with SWAC (with the proviso that the Board *must* consult with SWAC before adopting a solid waste management plan) is also left to the Board to determine. *See* 13:1E–20(b)(1).

Additionally, it is the Board of Freeholders that adopts the County's solid waste management plan and not SWAC. *See* *R.S.* 13:1E–23(a). Thus, it is obvious that SWAC is a purely advisory body under the SWMA. Consequently, the Court finds that meetings of SWAC are exempt from the provisions of

the Open Public Meetings Act and that the notice given to the Township of the December 12, 1984 meeting did not violate the Act.

The second alleged violation of the Open Public Meetings Act concerns the public hearing of December 27, 1984. As set out previously, the facts show that the public hearing which commenced on the evening of December 27, 1984 lasted for almost 12 hours, carrying over into the morning of December 28, 1984. Due to the length of the hearing, the Board adjourned the meeting for 12 hours and reconvened on the evening of December 28, 1984 to vote on the proposed resolution. Plaintiffs contend that these actions of the Board failed to give the public adequate notice of the portion of the hearing conducted on the evening of December 28 as required by the Open Public Meetings Act.

Plaintiffs principally rely on *Dunn v. Laurel Springs*, 163 *N.J.Super.* 32 (App.Div.1978) to support their argument. In *Dunn*, the Appellate Division held that a municipal governing body had violated the Open Public Meetings Act by not giving notice of a meeting held by it two days after another meeting. The Court in that case rejected the argument that there had been an adjournment of the first meeting, but found instead that two separate meetings had been held.

It certainly cannot be argued that *Dunn* stands for the principle that a public body can never adjourn a meeting without adequate notice. To adopt such a position ignores the reality that public bodies are often called upon to decide complicated issues with far-reaching implications. That reality is certainly evident in the circumstances presented here.

The meeting of the Board of Freeholders which opened in the evening of December 27 was, of all meetings in the state that week, the most open and public. It was attended by hundreds of members of the public, was publicized in the press, on the radio and television. The simple fact is that it lasted too long

for human endurance to permit a fair assessment and vote by the Board.

The facts of that hearing and its adjournment are clearly distinguishable from the facts in *Dunn*. In *Dunn*, at the first meeting held the governing body had been unable to break a tie vote on the issue at hand. For the second meeting which occurred two days later the *only* notice ever provided by the governing body came the day after the meeting was held. In contrast, in the situation presented here the Board elected to recess after the last witness had testified in order to allow the freeholders an opportunity to intelligently assess the information they had listened to for almost 12 hours before voting. The Court finds that the actions of the Board constituted a recess and not a cessation of the prior meeting. Indeed, had the Board not recessed, it might well have been subject to attack on the basis that it prolonged the meeting so long that no one was in an intelligent frame of mind to vote. This argument was, in fact, raised during the close of the public hearing. Under the circumstances, the Court finds the Board's decision to recess a wise and proper one.

Moreover, at the time the Board adjourned the first session of its meeting, the time of the reconvening was announced to the public and radio announcements of the time were broadcast throughout the day. It is difficult, if not impossible, to imagine what more the Board could have done. Unlike the situation in *Dunn* where the Appellate Division was concerned that what the governing body was attempting to do was to subvert the Open Public Meetings Act, the Court finds that the actions of the Board were an attempt to intelligently address an important public issue while working within the basic purpose of the Open Public Meetings Act.

The final allegation concerning the Open Public Meetings act involves a session held on December 10, 1984 at the home of Bruce Hasbrouck, the assistant county counsel charged with solid waste legal problems. Present at that meeting were John

Maier, Director of the Board of Freeholders, the other four Democratic freeholders, Bruce Hasbrouck, two representatives from Speitel and Robert Dixon, the County Planner responsible for solid waste matters.

Plaintiffs presented a number of witnesses who testified about this session on December 10, 1984. One of the witnesses was Paul Oland, a member of the Board of Freeholders. Oland was the lone dissenting freeholder at the time of the adoption of the resolution in question. He testified that the five Democratic freeholders were present as well as certain other county officials, including county counsel. The effect of his testimony was largely negated by his frank admission that he did not consider this session a "meeting" within the meaning of the Open Public Meetings Act—that he considered it an information session. He further stated that he did not consider the session a violation of the Open Public Meetings Act until after the fact when an editorial appeared in the *Gloucester County Times*, after which he then indicated that he entertained some doubts. The Court does not regard this witness's testimony as proving a violation of the Open Public Meetings Act. To the contrary, he testified that he did not so regard it.

John Maier, Director of the Board of Freeholders then and now, also testified about the December 10, 1984 session. Maier was on the stand for the better part of an entire day and the Court observed with interest the questions propounded and his answers thereto. Without going into exhaustive detail respecting his testimony, Maier testified, and the Court believes him, that he did not consider it a meeting within the meaning of the statute. Despite a vigorous effort on cross-examination, he did not depart from his position. Specifically, he stated the following facts:

(a) there was no formal meeting;
(b) there was no vote taken;
(c) there were no minutes kept;
(d) there was no formal action taken.

Maier further stated that at the session not only was the site in South Harrison, which was ultimately recommended by Speitel, discussed but also three other sites were discussed.

The Court gave counsel some leeway by way of limited cross-examination and leading questions because Maier is the director of the defendant body. The Court, however, did not consider Maier a hostile witness in the same sense as in a bitterly contested lawsuit between husband and wife, should the husband be subpoenaed to give testimony on behalf of the wife. The Court found Maier to be candid and truthful in his testimony and took his demeanor into account when passing upon the question of whether or not the session involved violated the Open Public Meetings Act.

From the testimony presented, it is clear that the session at the Hasbrouck home was a briefing session for the freeholders to go over the information gathered by Speitel which was intended to be presented to SWAC on December 12 for its recommendation. It is significant that a second and similar session was provided the Republican freeholders, including the Republican freeholder-elect, on the following night, December 11, 1984, with John Maier being in attendance. Thus, the entire Board was briefed in two separate sessions but at neither session was any action taken.

The situation closely resembles that in *Woodbury Daily Times v. Gloucester County Sew. Auth.*, 151 *N.J.Super.* 160 (L.Div.1977), *aff'd* 158 *N.J.Super.* 448 (App.Div.1978). In that case, an "effective majority" of the Gloucester County Sewerage Authority met with officials of the DEP to discuss the terms of an administrative order issued by the DEP. The Appellate Division affirmed the trial judge's conclusion that the purpose of the meeting was "informational for Authority members and not for the purpose of official action." *Woodbury Daily Times*, 158 *N.J.Super.* at 450. Under such circumstances, it was held that the group assembled was not a "public body" within the statutory definition.

During John Maier's testimony, he stated that he regarded the session as a political caucus, an obvious attempt to justify his actions by placing the session within the purview of the "partisan caucus meetings" exemption provided by *R.S.* 10:4–7.

It is difficult to justify the session as a partisan political caucus, notwithstanding that the combined sessions were of the freeholders according to their political affiliation. (It is certainly difficult to conceive of a Republican caucus attended by a freeholder director who was of the opposite party.) Such mental gymnastics are unnecessary, since it is clear that the purpose of this session was informational, no action was taken or intended to be taken, and the case falls within the purview of *Woodbury Daily Times, supra.*

The Court declines to give any sinister inference to the sessions with the Democratic freeholders on the 10th and the Republicans on the 11th. *Cf. Allan-Deane v. Bedminster,* 153 *N.J.Super.* 114 (App.Div.1977) (action of public body in holding private meeting was for sole purpose of circumventing Open Public Meetings Act). The issue in question is a complicated one with a high degree of technological expertise required and one which attracted a great deal of public attention. It is simply unrealistic to expect anybody, including the Gloucester County Board of Freeholders, to make an intelligent, informed decision without all the help they can get. The Court sees nothing wrong in briefing the Democrats one night and the Republicans the next, provided the briefing was as similar as could be made. No suggestion of such dissimilarity has surfaced.

In any event, if the session on December 10 did violate the Open Public Meetings Act, and the Court finds that it did not, the Court finds that any error was cured by subsequent actions of the Board. *R.S.* 10:4–15(a) provides that:

> a public body may take corrective action by acting de novo at a public meeting held in conformity with this act and other applicable law regarding any action which may otherwise be voidable pursuant to this section. [*R.S.* 10:4–15(a).]

After notice, which the Court finds adequate, the matter was hashed out for over 12 hours at a public meeting vigorously and actively participated in by citizens of the County. The action complained of, which resulted in this lawsuit, was the adoption of the resolution, which the Court finds was done in compliance with the Open Public Meetings Act.

By far, the most intriguing allegation of plaintiffs is the argument that the totality of circumstances surrounding the selection of the landfill shows that the Board's decision to site the landfill in South Harrison Township was predetermined. Many of the issues underlying this argument, such as the alleged inadequacies of the Speitel report, questions concerning the public hearing, the failure of the Board to consider alternatives, etc., have already been discussed by the Court and need not be re-hashed here. There remain, however, a number of issues that have yet to be discussed.

One aspect of the "totality of the circumstances" underlying the Board's actions which plaintiffs' claim show predetermination concerns the agricultural nature of the proposed site and the surrounding community. This issue has already been tangentially addressed in the Court's discussion of the factual basis underlying the selection of the proposed site, but to the extent that this issue has been raised by plaintiffs as a separate and distinct concern, the Court will discuss it.

In making this argument, plaintiffs point to the unique agricultural nature of the proposed site and surrounding area. Plaintiffs contend that this site, because of this agricultural nature, is so clearly unsuited for a landfill that only a mind already made up could have selected the site.

The Court recognizes the policies underlying such statutes as the Agricultural Retention and Development Act, *R.S.* 4:1C–11 *et seq.* and the Right to Farm Act, *R.S.* 4:1C–1 *et seq.* At the same time, the Court must recognize, as it has already been recognized by the Legislature and other courts, that the issue of solid waste management is at a critical threshold in this

State. Public officials are often faced with competing demands and are called upon to make choices that often sacrifice one demand for the sake of another. The Court, under the circumstances, cannot say that the choice made by the Board of Freeholders was an abuse of discretion.

The most strongly asserted argument asserted by plaintiffs on this issue of predetermination is the argument that the Board's decision was politically motivated. Stripped of the veneer of its decorous language, plaintiffs charge bluntly that the Board, Democratic by a 5–2 margin, selected the South Harrison site because South Harrison is (a) a sparsely populated municipality and (b) Republican controlled.

Plaintiffs produced as one of its witnesses on this issue Francis Witt. Witt is the Chairman of the Gloucester County Utilities Authority and until June 1985, was the Chairman of the Gloucester County Democratic County Committee; in short, the Democratic leader of the County. Witt related a pattern of meetings at a diner known as Five Points in Deptford Township over several months prior to the adoption of the resolution in question on December 27, 1984. While the constituency of the group attending these meetings was not strictly defined, it appears from the testimony that the meetings generally included the high ranking members of the Democratic party in the County (i.e., Freeholder Director, county counsel, county treasurer, etc.) The thrust of these meetings was either informative or on a policy-making basis. Witt conceded that, from time to time, the question of a landfill was discussed, and that the Township of South Harrison was mentioned.

Witt also testified along the same lines concerning a meeting at John Maier's house on September 18, 1984. The attendance at this meeting seems to be many of the same individuals who regularly attended the Five Points meetings with the addition of one other freeholder.

Significantly, Witt denied that there was ever any formal action taken at these meetings, minutes kept, votes taken or

decisions arrived at. He left the impression that what was sought (and obtained) was the consensus of the group (a group which only included one, perhaps two, freeholders).

Efforts made to impeach Witt by either the County or counsel for Kinsley were, in the opinion of the Court, futile. His testimony was just about as vague as one would expect from a person who had attended a series of meetings at which no notes or minutes were kept and this establishes credibility with the Court. Significantly, Witt did not state that the location of the South Harrison site was either (a) decided upon or (b) advanced for political reasons. Rather, he conveyed the impression that the major criterion was primarily the sparseness of population so that the assumed adverse effects of the landfill fell upon the least number of persons. If, in addition to this, the Township in which the landfill was sited happened to be controlled by the opposite party, then that would be well and good, but he did not agree that the site was selected primarily because of the political faith of the inhabitants of the Township.

The nature of Witt's testimony, when coupled with the testimony of William Fleming of Speitel, belie the argument that the South Harrison site was politically selected. Fleming testified that Speitel was not pressured in any way to select any particular site. His uncontroverted testimony was that no one told or even suggested a site to him, with the exception of Francis Witt, who presented a different site in South Harrison Township owned by a client of his. Fleming, however, testified that he was instructed by Bruce Hasbrouck, assistant county counsel, not to give Witt or his client any preference in reviewing any possible sites.

Another argument of improper motive on the part of the Board of Freeholders has also been alleged. Basically, the argument raised is that the Board voted to site the landfill in South Harrison in order to keep trash from the City of Philadelphia out of Gloucester County, thereby illegally hindering interstate commerce.

This argument ignores the fact that a county landfill is a public function—a government enterprise outside the realm of interstate commerce. What this argument attempts to do is to again attack the decision to close Kinsley's Landfill under the guise of this suit. The issue of Kinsley, as this Court has already stated, is not before this Court. This Court is concerned solely with the decision to site the county landfill in South Harrison and finds the actions of the Board to be in full compliance with the SWMA and the County's already pre-existing solid waste management plan, which called for the implementation of a county-owned landfill.

The Court has already discussed the December 10, 1984 session of the Democratic freeholders at the home of Bruce Hasbrouck as it relates to the Open Public Meetings Act, but a few observations on how that session relates to the issue of predetermination are in order. The Court has already examined the nature of that session and notes that in absolutely no way was the site in South Harrison determined at that meeting to be a *fait accompli*. Indeed, as John Maier's testimony shows, a number of possible sites were discussed in the briefing to the freeholders. Thus, this situation is sharply distinguishable from the situation presented in both *Cullum v. Board of Education of North Bergen*, 15 *N.J.* 285 (1954), and *Grogan v. DeSapio*, 11 *N.J.* 308 (1953), where the public body involved had met in private and voted and passed resolutions subsequently presented to the public without deliberation or the opportunity for public comment.

Moreover, the testimony of Paul Oland, the lone dissenting freeholder, is highly relevant on this issue. He testified frankly and the Court believes honestly that he was not instructed at the session on December 10 (or at any time up to and including the public hearing on December 27) how to vote on the merits of the resolution in question. His testimony sharply undercuts any argument that the Board predetermined the proposed landfill site.

One last argument advanced to demonstrate the lack of informed judgment, or prejudgment, of the Board of Freeholders, is that it made a decision at all in the light of the record before it. The printed transcript of the public hearing occupies 504 pages. The reports and exhibits available to the Board were numerous. The last attorney to argue before the freeholders, William Horner, argued against the decision on the spot and during a subsequent colloquy as to the adjournment and time of the reconvention, one of the previous witnesses, Debbie Conaway, argued that a transcript could not possibly be prepared in time, pointing out: "there is factual information in that young lady's stenographic notes that must be reviewed to properly make your decision" (T–504).

In response, Director Maier pointed out that the Board members were taking notes, indicating that he could give by number and by comments what each and every speaker said. Two other freeholders who testified also indicated that at the close of the twelve-hour hearing they took some time during the twelve-hour recess to consider the testimony that they had heard.

The minds of men work at different speeds. What one man will take all day to consider another can handle in an hour. The failure of the Board to obtain a transcript prior to acting was not a fatal omission. Jurors decide cases without transcripts. The Board took notes; each freeholder to testify stated that he considered all the facts in evidence in arriving at his decision and it is not possible to go behind that comment. The Board, at that stage, was in a "damned if you do, damned if you don't" situation; if it had taken an immediate decision, the charge of prejudgment might be more easily conceived. By taking a twelve-hour delay to allow for a mental re-grouping, the Board gave itself some opportunity for in-depth reflection. The freeholders who testified stated they had adequate input. The Court agrees.

Under the evidence and testimony presented, this Court cannot say and will not find that its actions were based on shallow or pre-conceived or prejudged or any other questionable factor. To the contrary, the Court feels the Board did the best it could under the circumstances and that its action sustained legal scrutiny.

Finally, plaintiffs argue that the actions of the Board must be set aside because the totality of the circumstances shows that the substantive and procedural constitutional rights of plaintiffs were violated. The Court has already addressed the issues which plaintiffs contend create a totality of arbitrary action and has found that the Board's actions were not arbitrary and capricious. Insofar as the Court has found no factual basis for any alleged constitutional violation, this allegation of plaintiffs is without merit.

By way of summary, the Court points out that the true test by which the actions of the Board of Freeholders must be judged is not whether it picked the best site, certainly not whether the Court agrees with its selection of a site, or whether it should consider any other site. The issue is whether or not the Board of Freeholders abused its discretion in its amendment to its Solid Waste Plan as evidenced by the resolution of December 27, 1984.

It is not infrequently that this Court, in prerogative writ cases, finds itself in total disagreement with the actions it reviews. Whether this disagreement does or does not exist in this or any other case is not really important. What is important is that the actions of this Court be, as are the actions of the Board of Freeholders, governed by a rule of law. To suggest, as one writer has done in a different field that a court decision be based upon "the gut reaction of the judge as to what is fair and just," *Meiser, Tenant-Landlord Law in New Jersey*, at 41, is repugnant to our judicial system and is rejected by this Court. There are many times when this Court disagrees, sometimes violently, with the particular decision it

reviews. Nevertheless, when a judge allows his personal philosophy of law, of life or of fairness to override that decision which an impartial review of the law and facts dictates, he ceases to be a judge and becomes either a tyrant or a dictator or both. That is one road this Court declines to travel.

Viewed in its entirety, the Court finds that plaintiffs failed to sustain the burden of proving that the actions complained of by any body or individual added up to a prejudgment, which would mean that the freeholders had previously made up their minds and all of the proceedings referred to were merely a ritualistic litany of no real meaning. The Court rejects this argument and finds to the contrary.

Based upon the evidence and testimony adduced in this case, the Court, without intending in any way to intimate its own reaction to the chosen site, finds that the actions of the Gloucester County Board of Freeholders were in due compliance with the procedure outlined by the Solid Waste Management Act and the Open Public Meetings Act, that both South Harrison and its individual plaintiffs and Kinsley were given ample, and indeed more than ample, opportunity to present their case to the Board prior to the adoption of the resolution; that the actions of the Board were neither prejudged or based upon a political motive and thus are free from any taint. The Court further finds that the Board did not abuse its discretion in adopting the resolution under attack and therefore dismisses the complaints of all plaintiffs.

Counsel for the County should submit an appropriate order.

SWAC conducted a special meeting on December 12, 1984 to consider the Speitel report. The meeting commenced at approximately 6:00 p.m. and was adjourned at approximately 7:15 p.m. During the meeting, SWAC voted (9–1–4) to adopt the recommendation to site a county-wide landfill in South Harrison Township.

South Harrison Township was informed of the SWAC meeting at approximately 12:00 a.m. on December 12, 1984. South

Harrison charges that the actions of the SWAC at the meeting on December 12, 1984, (the perfunctory nature of the SWAC consideration and approval of the Speitel report and SWAC's refusal to postpone its action on the report) have efficiently denied plaintiffs and other parties a right to meaningfully participate in the solid waste management planning process in violation of *R.S.* 13:1E–2.b(3). In this respect, the cited section of the statute reads:

> (3) provide citizens and municipalities with opportunities to contribute to the development and implementation of solid waste management plans by requiring public hearings prior to their adoption *and* by creation of solid waste councils.

It is to be noted that this statute is in the disjunctive and not the conjunctive and does not require a public hearing prior to the action of a solid waste council.

In any event, the Court finds that the Township and individual plaintiffs, in fact, have had an opportunity to participate meaningfully (if such be the legal requirement) by their appearance before the SWAC and by their vigorous, active, planned and meaningful participation in the public hearing of December 27, 1984.

In an effort to challenge the regularity of the proceedings, plaintiffs produced the testimony of John Gyer, a member of SWAC. Gyer complained of the short notice and attempted to convey the impression that an incomplete record was delivered to him at a meeting of SWAC on December 12, 1984. On cross-examination, however, he equivocated. The Court has examined the resolution and notes that of the fourteen members voting, nine voted in favor, one against, and there were four absentions; one of which was Gyer. Nothing in Gyer's testimony is sufficient to overcome the presumption of regularity to be afforded the action of SWAC and the Court finds the same regular, noting, however, in passing, that the resolution and actions of SWAC were merely advisory.

The Board of Chosen Freeholders on Friday, December 14, 1984 and again on Sunday, December 16, 1984, caused notice of a public hearing to be held by the Board on December 27, 1984.

(The Court finds Kinsley's attempt to challenge these two publication dates to be totally specious. Proof of publication in the form of a sworn affidavit was admitted into evidence as a *Joint Exhibit* (E–19). The Court finds as a fact that notice was published on those dates.) The purpose of the public hearing was to consider an amendment to the County Solid Waste Management Plan designating the South Harrison site for the county landfill.

Plaintiffs contend that the notice given by the Board did not comply with the notice requirements of the Solid Waste Management Act, *R.S.* 13:1E–1 *et seq.* Specifically, plaintiffs argue that the Board violated the notice provision of *R.S.* 13:1E–23(d).

This provision provides that notice of a public hearing shall be:

published in a newspaper of a general circulation in the solid waste management district once each week for 2 consecutive weeks, and the last publication shall not be less than 10 days prior to the date set for the hearing. [*R.S.* 13:1E–23(d).]